1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  CHRISTOFFER LEE (CABN 280360)
   NIKHIL BHAGAT (CABN 279892)
5  Assistant United States Attorneys

6      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
7      Telephone: (415) 436-7200
       FAX: (415) 436-7234
8
   Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11
                         SAN FRANCISCO DIVISION
12

13 | UNITED STATES OF AMERICA,              ) CASE NO. 3:25-CR-00126 CRB
                                            )
14 |     Plaintiff,                         ) **MOTION FOR DETENTION PENDING TRIAL**
                                            ) **AND MOTION TO CONTINUE DETENTION**
15 |    v.                                  ) **HEARING**
                                            )
16 | KENNETH W. MATTSON,                    )
                                            ) Date:  May 23, 2025
17 |     Defendant.                         ) Time:  10:30 a.m.
                                            ) Court: Hon. Alex G. Tse
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 3

LEGAL STANDARD ................................................................................................................ 3

FACTS ........................................................................................................................................ 5

ARGUMENT ............................................................................................................................ 11

I. The Court Should Hold a Detention Hearing, and There is Good Cause to Continue it for at Least One Business Day, to May 27, 2025. ................................................................. 11

II. There are No Conditions or Combination of Conditions That Will Reasonably Assure the Defendant's Appearance at Future Court Proceedings. ...................................................... 12

    A. The Defendant is Facing Significant Consequences in the Criminal Case ........................ 12

    B. There is Overwhelming Evidence of the Defendant's Guilt. ............................................. 13

    C. The Defendant Has Substantial Means to Flee. ................................................................. 14

    D. Defendant's History and Characteristics Heighten the Risk of Flight .............................. 15

III. The Defendant Poses an Economic Danger to the Community and his Ongoing Possession of Firearms Poses Some Risk of Physical Danger. ................................................ 17

CONCLUSION ......................................................................................................................... 18

## INTRODUCTION

The United States hereby moves for the defendant's detention pending trial. In a case where the defendant poses a serious risk of flight *or* a serious risk that he will obstruct or attempt to obstruct justice, the Court must hold a detention hearing pursuant to 18 U.S.C. § 3142(f)(2). The defendant Kenneth Mattson poses *both*. Moreover, there is good cause to continue that hearing by at least one business day, to May 27, 2025, to provide the victims in the case a meaningful opportunity to exercise their statutory right to participate in any hearing regarding release or detention, and to enable Pretrial Services sufficient time to conduct a thorough investigation. As set forth below, on the present record, given the significant risk of nonappearance and economic danger to the community presented by this defendant, no condition or combination of conditions will reasonably assure his appearance as required and otherwise protect the safety of any other person and the community. The Court should order Mattson's pretrial detention.

As discussed more fully below, Mattson has access to significant amounts of cash and property and has taken steps to secret those assets from creditors and law enforcement since his scheme was initially discovered and after he became aware of the SEC and criminal investigation. The access to significant assets, and his conduct that obfuscates the location and amount of those assets, poses a serious risk of flight. In addition, his demonstrated obstructive conduct as charged in the indictment and other instances of obstruction and destruction of documents described below, are evidence of a risk that he will continue to attempt to obstruct these proceedings and further investigation of his conduct.

## LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In a case involving *either* a "serious risk [the defendant] will flee" or a "serious risk that [the defendant] will obstruct or attempt to obstruct justice," or tamper with witnesses, the Court must hold a detention hearing. 18 U.S.C. § 3142(f)(2). Although the statute does not specify the government's burden to obtain a detention hearing, many courts have concluded that the government must merely show by a preponderance of the evidence that the risk exists. *See, e.g., United States v. Friedman*, 837 F.2d 48, 49

(2d Cir. 1988); *United States v. Subil*, No. 2:23-cr-00030-TL, 2023 WL 3866709, at *4 (W.D. Wash. Jun. 7, 2023). Importantly, the preliminary showing for a detention hearing is just that the *risk* exists, not that the defendant has or will flee or obstruct justice.

At a detention hearing, the standard changes: the government bears the burden to show by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's appearance or by clear and convincing evidence that the defendant is a danger to the community. *See United States v. Spirea*, No. 3:24-cr-00383-2-AN, 2024 WL 4903759, at *1 (D. Or. Nov. 27, 2024) ("In other words, once the detention hearing is triggered by (f)(1) or (f)(2), Section 3142(e) necessarily requires the court to consider whether the defendant presents a risk of nonappearance or danger to the community and whether there are conditions that can mitigate those risks. Thus, Section 3142(e) requires courts to consider both the risk of nonappearance and danger to the community regardless of whether (f)(1) or (f)(2) opened the gate to the detention hearing").

At such a hearing, "the Bail Reform Act mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Those factors include (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

In some cases, the unmitigated prospect of obstruction alone may itself serve as a basis for detention. Even prior to the Bail Reform Act, courts recognized "an inherent right of the trial court to protect the integrity of the judicial process by ordering detention if necessary" in circumstances relating to obstruction, such as "subsequent information that the defendant has threatened or plans to injure or intimidate a juror or witness or plans to flee." *See* 131 Cong. Rec. S00000-12, 1985 WL 707152, 53. *See also* Order, ECF No. 92, *United States v. Combs*, No. 1:24-cr-542-AS (S.D.N.Y. Nov. 27, 2024)

1  (considering, in order detaining defendant pending trial, "evidence supporting a serious risk of witness
2  tampering").

3  **FACTS**

4  On May 13, 2025, a federal grand jury in the Northern District of California returned an
5  indictment charging the defendant with seven counts of wire fraud in violation of 18 U.S.C. § 1343, one
6  count of money laundering in violation of 18 U.S.C. § 1957, and one count of destruction of records in a
7  federal investigation (obstruction of justice), in violation of 18 U.S.C. § 1519. *See* Indictment, ECF No.
8  1 ("Indictment"). The indictment sets forth detailed factual allegations regarding the scheme and the
9  allegations against the defendant. *See id.* at ¶¶ 1-43.

10  For at least 15 years, Mattson was the President of LeFever Mattson ("LM"). LM invested in
11  real estate using subsidiary limited partnerships. In the ordinary course, LM served as the general
12  partner of these limited partnerships and solicited investors to invest in the properties by becoming
13  limited partners.[1]

14  In essence, the Indictment alleges that for more than a decade, Mattson engaged in a massive
15  fraud scheme in which he obtained money from victims who believed they were investing in legitimate
16  LM-backed and LM-managed limited partnerships and provided the investors with false documents and
17  records to make them believe his fiction. In truth, these investors never actually held interests in real
18  property, and never had the right to collect rents or sale proceeds from those properties. To the extent
19  that Mattson ever paid the promised distributions to these "off-books" investors, that money did not
20  come from the rents of the underlying property owned by the specific LM limited partnerships, as
21  Mattson had promised; rather, it came from a hodgepodge of comingled funds, including funds from
22  new investors, in the manner of a Ponzi scheme. Separately from the detailed allegations in the
23  Indictment concerning LM partnerships, investors have reported that they were also defrauded by
24  Mattson via investments with a separate Mattson-controlled investment firm, KS Mattson Partners, LP:
25  Mattson told these investors they were investing in shares of limited partnerships or other investments
26  that owned specific pieces of property, but he in fact used their money for unrelated business ventures

27

28  [1] Under state law, a general partner is responsible for the day-to-day operations of the business, while limited partners are simply investors. *See generally* Cal. Corp. Code §§ 15900–15912.07 (2024).

and personal expenses. *See* Indictment ¶ 5.

In light of Mattson's shell game that moved investor money around from account to account, property to property, and loan to loan, and defrauded investors continuing to come forward, efforts to ascertain a precise dollar amount for his fraud—and to ascertain the location and ownership of his assets—are ongoing. But some numbers are telling. An analysis of just three accounts controlled by Mattson—the -1059 LM account referenced in the Indictment, a KS Mattson Partners operating account, and an account in the name of a Central Valley mobile home park, reveals that between 2019 and 2024, these three accounts alone had total debits of approximately $346 million and total credits of $341 million. Indictment ¶ 40. These accounts comingled investor money, rents and proceeds from unrelated properties, and other large deposits, while debits from the accounts included Ponzi-like distribution payments and funds for Mattson's own benefit and personal expenses. A preliminary analysis identified millions of dollars in personal expenses, including $4 million in credit card payments Mattson paid from those three accounts during that five-year period. That same analysis has identified that Mattson used at least $11 million from the -1059 LM account, in which he primarily deposited off-books investors funds, to fund personal mortgage payments on Mattson-owned properties in Del Mar, Sonoma, and Piedmont.

In addition to his multi-million dollar fraud, Mattson has a history of willfully ignoring financial reporting or filing obligations: Mattson was a registered tax preparer for more than 10 years, and regularly prepared and filed income tax returns on behalf of LM, its subsidiary limited partnerships, and numerous individual victim investors. Yet Mattson and Mattson's KS Mattson Partners entity have failed to file their *own* federal tax returns since at least 2017.

There is substantial evidence that Mattson has already obstructed justice, and the indictment charges an episode of obstruction directly related to the charged conduct and the victim investors. A forensic examination of electronic devices seized pursuant to a search warrant revealed that on May 22, 2024, Mattson deleted more than 10,000 files from the "Recycle Bin" of his laptop computer. Another approximately 4,000 files were deleted from unknown folders at approximately the same time.

This document deletion occurred after he had engaged counsel, after he had learned that LM had reported him to federal criminal authorities, and after he had been placed on notice of an SEC

investigation, warned in writing to preserve all relevant documents, and served a subpoena seeking these documents. A copy of that subpoena was later found in his home.

Although the FBI's computer forensics technicians have not yet been able to recover the contents of the files that Mattson deleted, they were able to identify the file names. A review of those file names tends to show that Mattson specifically deleted files directly relevant to both the criminal and the SEC investigation. These files included Quicken Data Files (.QDF), H&R Block tax return files (.22l), and Adobe Acrobat files (.pdf). The file names make it apparent that these files included IRA custodian paperwork for "off-books" Divi Divi Tree investors, false K-1s and Forms 1065 for "off-books" investors, Schedule A listings of investors in certain properties, purchase agreements that Mattson had provided to "off-books" investors, investor tax preparation documents, and LeFever Mattson and KS Mattson Partners Quicken data files. *See* Indictment ¶¶ 51-62 (obstruction of justice charge). The deleted files included names such as:

- "[Investor Name] DDT Fed K1.pdf"
- "[Investor Name] HPLP Fed.pdf"
- "2009 Divi Divi Tree LP form 1065 - only.pdf"
- "Quicken_Deluxe_2010.exe"
- "[IRA Custodian] – IRA Investment Authorization Alternative Equity – [Investor Name].pdf"
- "Heacock Partnerspurchaseagreement [Investor Name].pdf"
- "Heacock Park LP agreement.pdf"
- "Heacock and Sienna Pointe Valuation 11.19 to 10.20 (002).xlsx"
- "DiviDiviExeLP.pdf,"
- "Divi Divi LP Agree.pdf"
- "Divi Divi LP Amend 2015.pdf,"
- "FMV DDT 2018 [IRA Custodian].pdf"
- "KsanCpy.QDF"
- "Lm1Cpy.QDF"
- "LM's Quicken Data.QDF-backup"
- "LeFever Mattson PSA – Sienna Pointe (Template).docx"
- "Sienna Pointe & Heacock Park_LOI_01.22.21.pdf"
- "SIENNA SCHEDULE A.pdf"
- "Sched A Sienna [Investor].pdf"
- "dividivisaleagreement[Investor]IRA.doc"
- "KSP_InvestorsList.xlsx"

On the same day that Mattson deleted the files from his computer, he obtained a new cellular phone, and that same evening, footage from surveillance cameras in his residence captured Mattson and a family member removing trash bags full of unknown materials from Mattson's Sonoma residence. At one point, the other family member appears to have remembered the camera's presence and placed an object over it:




Two days later, on May 24, 2024, federal agents executed a search warrant at that Sonoma residence. Although they found Mattson's electronic devices, which he had wiped of substantial evidence, it is notable what they did not find: no significant quantity of cash, jewelry, or cash equivalents, notwithstanding millions of dollars used to purchase personal expenses and pay for credit card bills over the past five years. Nor did agents find the multiple firearms registered to Mattson.

In addition to his deletion of thousands of files from the computer, there is other evidence that

Mattson sought to obstruct the investigation. Mattson used a cloud-based filesharing service for his LM-related work, including to communicate with investors and his assistant, and work on investors' tax returns. Records from that cloud filesharing service show that on May 23, 2024—the day after the files were deleted from Mattson's computer and the day before federal law enforcement searched his house—Mattson deleted two files or folders from that account, within minutes of one another. Significantly, prior to that date, despite regular use of the account, the last time Mattson had deleted anything was 2022—well before his scheme became known to LM or the authorities.

Additionally, on March 15, 2024, more than 16,000 files were deleted from the cloud filesharing service account associated with an email address used by a Mattson family member. March 15, 2024 is significant because in the hours before the files were deleted, Mattson had an in-person meeting with an LM representative, wherein they discussed, among other things, Mattson's "off books" activities and the representative told Mattson that people were using words like "fraud" to describe his actions. Prior to March 15, 2024, the last time anything had been deleted from the account was 2022.

Following the search warrant execution, Mattson attempted to re-enter properties he recently sold to remove art. In May 2024, Mattson, through KS Mattson Partners, sold approximately 13 properties to new owners. In an episode in June 2024, weeks after escrow had closed, Mattson and a family member returned to the Sonoma's Best Mercantile, a property they had sold, on a Sunday, when it was closed and they likely assumed no one would be present. They used a key to enter through a rear door and started removing artwork from the walls. One of the new owners, who observed the break-in from a remote video feed, called the Sonoma County Sheriff. Deputies responded and required that the Mattson leave the artwork at the property. The new owners also told at least one witness that Mattson had engaged in similar behavior—taking things that no longer belonged to him, long after he had sold the property—at the Sonoma Cheese Factory.

In July 2024, in an apparent attempt to place it out of reach of potential creditors, Mattson transferred title from at least one property he owned in Del Mar, California. Specifically, Mattson transferred a valuable residence from KS Mattson Partners to an LLC controlled by a third party. KS Mattson then immediately loaned $19 million to the LLC, interest-free, to effect the transfer of the property. This had the effect of taking Mattson's name off the property's title, allowing the purported

"sale" to take place with little or no cash being paid, while also preserving his ability to later control the property through a lien. The mortgage, however, stayed in the name of KS Mattson Partners, and Mattson promised to continue to make the mortgage payments despite the change in legal ownership. Since the sale, the person who controls the LLC has paid Mattson more than $250,000 in rent for this and another property he rents from Mattson, but Mattson has failed to make the required mortgage payments and it is unclear where that money has gone.[2]

Despite pleas from investors begging him to return their money, and during the SEC and FBI investigation of the investment fraud scheme, Mattson has continued to spend lavishly on himself—showing that he continues to have access to significant amounts of funds. In September 2024, Mattson and a family member purchased two brand new vehicles, in cash paid-in-full—one for $105,059.16[3] and one for $84,473.50. But in what appears to be another attempt to evade his creditors and the government, Mattson was careful to title both trucks in only the family member's name and pay for them from a bank account that is titled in only the family member's name. That bank account was not opened until March 20, 2024—after LM had confronted him with evidence of the fraud and he had signed an indemnification agreement.

The Mattson family used that same bank account for substantial transactions, including several high dollar ATM withdrawals of untraceable cash. For example, between April 23, 2024, and May 8, 2024 they withdrew $5,000 in cash in $500 increments. In four separate transactions between June 20 and July 11, 2024, $4,000 in cash was withdrawn from the account. In June and July, they deposited over $80,000 in cashier's checks and processed more than $1,000,000 in what bank records reflect as "requested withdrawals." In July 2024, they wrote a $10,000 check to yet another family member. On September 13, 2024, there was a teller deposit of $100,000. In January 2025, they sent thousands of dollars from that account to the KS Mattson Partners account.

There is also evidence that Mattson has continued to pay a few select investors and lenders in

---

[2] According to a third party who controls the LLC, during this deal, title to a second Del Mar property owned by Mattson was inadvertently transferred to the third party as well. This too had the effect of removing Mattson from the title of that property. To date, Mattson has refused to correct the error and take back title to the property.

[3] The Mattson family received a $10,000 trade-in credit for this purchase, so they only had to write a check for $95,059.16.

2024 and through 2025. On May 15, 2024, an investor wrote Mattson: "Today I am contacting the FBI and the California Department of consumer affairs. YOU ARE GOING TO JAIL. If you want me to keep my mouth shut you will kindly return all of my money ASAP." Law enforcement has not been able to get in touch with that person. On May 10, 2024, while other investors were desperately attempting to get any portion of their money back, Mattson wired more than $203,000 to one apparent investor—evidence that he has access to significant funds and is willing to use those funds to gain the cooperation of potential witnesses.

At the time of Mattson's arrest on May 22, 2025, he was found in possession of, among other things, a laptop computer, at least four USB flash drives, approximately $9,104.00 in United States currency, and two safe keys.

## ARGUMENT

**I.     The Court Should Hold a Detention Hearing, and There is Good Cause to Continue it for at Least One Business Day, to May 27, 2025.**

Here, as set forth in the Indictment and in the government's proffer above, the defendant deleted thousands of relevant files from his computer, engaged in suspicious transfers of real estate, concealed purchases of high-value items in the name of a family member, and dissipated assets that would otherwise be available for restitution. Not only is there a "serious risk" that the defendant will obstruct or attempt to obstruct justice; he has already done it. Now that he has been indicted, arrested, and faces decades in prison, his incentives to continue this conduct have only intensified. The Court is required to hold a detention hearing under 18 U.S.C. § 3142(f)(2)(B). Moreover, the defendant's substantial access to millions of dollars in assets, through either properties still in his exclusive control or unaccounted-for assets, such as the more than $9,000 in cash found in his vehicle at the time of his arrest, give him substantial means to flee the jurisdiction, so the government is alternatively entitled to a detention hearing under 18 U.S.C. § 3142(f)(2)(A).

Under the law, where good cause exists, the Court may continue a detention hearing for up to three business days upon the government's request. 18 U.S.C. § 3142(f)(2). Here, good cause exists for a brief continuance for at least two reasons. First, this is a complex case involving a defendant with access to millions of dollars and innumerable properties. Any pretrial services report the Court might

consider to aid in its decision could not reasonably be completed before May 27.

But also importantly, the victims in this case have a statutory right to be heard at "any public proceeding in the district court involving release." *See* 18 U.S.C. § 3771(a)(4). The purpose of the right to be reasonably heard is "to allow the victim to appear personally and directly address the court." *Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1016 (9th Cir. 2006) (citing the CVRA's legislative history at 150 Cong. Rec. S4268 (daily ed. April 22, 2004) (statement of Sen. Kyl)). Victims "have an indefeasible right to speak," one which "cannot be defeated, revoked, or made void." *Id.* The CVRA "clearly meant to make victims full participants" – a victim has the right "to look *this* defendant in the eye and let him know the suffering his misconduct has caused." *See id.* at 1016-17 (emphasis in original). Consistent with that purpose, the Ninth Circuit has concluded that the "right to be reasonably heard" under the CVRA provides victims the right to speak at proceedings covered by the CVRA. *Id*. Although *Kenna* was a case about sentencing, its logic applies equally to detention hearings. *Accord United States v. Turner*, 367 F. Supp. 2d 319, 333 (E.D. N.Y. 2005) (victims have the right to be heard at detention hearings).

This is a matter involving hundreds of potential victims. They are entitled to receive notice of, and speak at, any hearing involving release. The Court should continue the detention hearing to allow them a reasonable opportunity to receive notice of that hearing and participate in it.

## II.    There are No Conditions or Combination of Conditions That Will Reasonably Assure the Defendant's Appearance at Future Court Proceedings.

### A.    The Defendant is Facing Significant Consequences in the Criminal Case

Mattson has been charged with orchestrating a long-running Ponzi scheme with hundreds of victims. He has every incentive to flee. The Indictment charges him with seven wire fraud counts, money laundering, and obstruction of justice. Each count carries between a 10 and 20-year statutory maximum. Given the nature of the scheme, the number of victims, and the loss amount, an overly conservative estimate of the low end of his Guidelines range, assuming acceptance of responsibility, is at least 188 months, or 15 years, incarceration. The seriousness of the charges, reflected in the penalties that Mattson faces, provides a substantial incentive to flee. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the

defendants have an even greater incentive to consider flight."); *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond).

### B. There is Overwhelming Evidence of the Defendant's Guilt.

Likewise, overwhelming evidence of the defendant's guilt "makes it more likely that he will flee," particularly in light of the term of imprisonment that Mattson faces here. *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (affirming district court finding government met burden of showing flight risk and danger to the community in motion for pre-trial detention pending re-trial). Although the strength of the evidence is the least important factor in a bail decision, the Court is required to consider it in assessing whether there are conditions that can reasonably assure a defendant's appearance. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985).

Here, Mattson signed an indemnity agreement with LM in January 2024 wherein he admitted to, among other actions, entering into "numerous" Third Party Transactions "with individuals and/or entities pursuant to which [Mattson] has secured funds on terms and conditions not clearly documented" and the parties, including Mattson,

> acknowledge and agree that: (i) none of the Third Party Transactions were presented to the Board or shareholders of LeFever Mattson prior to the date that the Third Party Transactions were entered into, (ii) none of the Third Party Transactions were authorized or approved by the Board or shareholders of LeFever Mattson at any time prior to or after the date that the Third Party Transactions were entered into, (iii) neither LeFever nor LeFever Mattson is in any way a party to or obligated in connection with any of the Third Party Transactions, and (iv) neither LeFever nor LeFever Mattson received any benefit, directly or indirectly, economic or otherwise, in connection with or as a result of the Third Party Transactions.[4]

In other words, Mattson has already admitted to the core fraud alleged in the Indictment—that contrary to his representations to investors, LM did not know about any of the off-books investors, and LM was never liable to any of the investors.

The admissions contained in the indemnity agreement are corroborated by Mattson's written and

---

[4] Mattson has sought recission of this agreement in the course of state civil proceedings, but regardless of whether he is successful there, it would be admissible against him in any criminal trial as a statement of a party-opponent. *See* Fed. R. Evid. 801(d)(2).

oral representations to hundreds of investors. Many investors took detailed and contemporaneous notes of Mattson's oral representations to them over the years; he also created and provided them fraudulent written contracts to make the investments appear legitimate. Despite his attempts to delete his own copies of those documents, many investors still have them and have provided them to the government. Those notes and documents are corroborated by Mattson's emails and his text messages.

What's more, in May 2024, Mattson confessed to at least one witness. He told that witness, among other things, that he was sorry, that there was no explanation for what he had done, that he had falsified documents, including Form K-1s, and acknowledged that it was likely he would go to jail.

The evidence against Mattson is overwhelming, which provides a substantial incentive to flee.

### C.   The Defendant Has Substantial Means to Flee.

As alleged in the Indictment, hundreds of millions of dollars flowed through Mattson-controlled accounts between 2019 and 2024. Mattson did not maintain dedicated client trust accounts and instead comingled funds for dozens of purported investments across several accounts, all used for a jumble of unrelated business ventures and personal expenses. These actions further obfuscated Mattson's financial web and make it more difficult to ascertain the exact amount of money he may have set aside to aid in flight. The scheme began at least decade before that, and older financial records—and therefore details on luxury items purchased and cash withdrawn earlier in the scheme—are unavailable. But the records the government does have suggest that Mattson may have access to funds that could enable escape.

A review of just the direct payments from the -1059 Account—the account that Mattson maintained in the name of LM and utilized to accept funds from and pay off-books LM investors—reveals Mattson used this account to pay millions of dollars in credit card bills between 2019 and 2024, which were in turn used for a myriad of personal expenses—money that went to Mattson's regular haircuts and gym membership, a firearms dealer, a wedding vendor, and men's clothing vendors. During this period, almost $20,000 went to a medical spa that advertises itself as "a leading provider of Botox and other fillers," $719,000 to retail and shopping, $13,000 to jewelry merchants, including a Rolex purchase, and $18,500 in cash withdrawals. The cash vehicle purchases described above illustrate the risk well: because they were paid for in full, they could be sold easily and cash proceeds from the sale could assist in flight. The whereabouts of the approximate $250,000 received in rents from the Del

Mar property are also unknown and presumably available to Mattson. Finally, despite these excessive expenses, when agents searched Mattson's home, they found no significant quantity of cash or cash equivalents, and no substantial amounts of jewelry. But even when Mattson was arrested on May 22, 2025, he was found with more than $9,000 in cash and two keys that appear to belong to safes. This suggests that Mattson maintains at least one unknown secondary location in which such items of value, and likely additional cash that could be used to facilitate flight, may be stored.

Coupled with evidence of attempted asset dissipation, such as the Del Mar property transfers, this flow of funds tends to show that Mattson has the means to use funds that are unknown to and out of the reach of the court to facilitate his fight away from the jurisdiction.

### D. Defendant's History and Characteristics Heighten the Risk of Flight

Defendant has operated within regulated industries and flouted rules before: despite being a registered tax preparer, he hasn't so much as bothered to file his own taxes for at least eight years.

In the bankruptcy litigation, Mattson's creditors sought relief from the court when they learned that Mattson's civil counsel had begun contacting select Mattson investors to work out informal settlements outside of the bankruptcy process. *See In re Mattson*, No. 24-10714, ECF Nos. 52 –54 (Bankr. N.D. Cal.); *In re KS Mattson Partners LP*, No. 24-10715, ECF Nos. 75–77 (Bankr. N.D. Cal.).

That litigation appears to have eventually led to the entry of preservation orders that preclude Mattson from transferring or encumbering real property or engaging in personal property transactions exceeding $15,000.[5] But those orders cannot sufficiently mitigate the risk of flight here. First, they do not preclude Mattson from structuring cash transactions in amounts under $15,000. Second, the only apparent mechanism to ensure compliance appear to be Mattson's own periodic self-certifications. *See* ECF Nos. 72, 96 (Case No. 24-10714); ECF Nos. 95, 123 (Case No. 24-10715) (orders imposing limits and defendant's certification that he is in compliance).

Given Mattson's history of violating legal obligations, such as the charged destruction of evidence in contravention of the SEC subpoena, the government has concerns about whether Mattson

---

[5] *See* Preservation Ord., ECF No. 91, *In re Kenneth W. Mattson,* No. 24-10714 (Bankr. N.D. Cal. May 15, 2025); Preservation Ord., ECF No. 118, *In re KS Mattson Partners LP*, No. 24-10715 (Bankr. N.D. Cal. May 15, 2025); *see* ECF Nos. 72, 96 (No. 24-10714); ECF Nos. 95, 123 (No. 24-10715).

will abide those orders, which were just entered last week. But even if he did, Mattson nonetheless has access to funds and means of flight because he still can still structure transactions under the bankruptcy court's limit, and apparently has access to thousands of dollars in cash, like the $9,100 found in his vehicle at the time of his arrest.[6] Moreover, the bankruptcy court's order does not reach any assets he controls that may be held in the name of family members or other entities. Those assets can be dissipated not only to aid in flight, but also for his personal benefit at the detriment of restitution that may be due his victims following a conviction.

Likewise, the charged obstruction—in direct defiance of a preservation letter and a subpoena from the SEC—further demonstrates the likelihood he will not follow court orders inviting his continued participation in the criminal case. Even strict proposed release conditions can "contain one critical flaw[:] In order to be effective, they depend on [the defendant]'s good faith compliance." *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (quoting *United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) ("extensive set of release conditions contained 'an Achilles' heel . . . virtually all of them hinge on the defendant's good faith compliance").

The defendant was willing to obstruct justice before being charged, and his incentive to impede the government's case is even greater now. *See United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) ("[O]bstruction of justice has been a traditional ground for pretrial detention by the courts, even prior to detention for dangerousness[.]"). The obstructive actions described above, including the deletion of files on both his computer and a cloud storage account, illustrate that the defendant does not respect the law and will take any steps necessary to evade prosecution. *See United States v. Burke*, 2013 U.S. Dist. LEXIS 134427, *1-2 (S.D. Fla. Sept. 17, 2013) (finding that where a defendant engaged in "methodical and repetitive efforts to defraud and evade detection," this "pattern of deception suggests that [the defendant] would continue to pose a danger of further harm to the community if released"). Such a defendant cannot be trusted to abide by any conditions of release.

Although Mattson does not currently hold a valid U.S. passport, that is no bar to him, a person of vast wealth and financial expertise, from fleeing the country. There are countless examples of

---

[6] $9,100 is also just short of the $10,000 Treasury Department threshold for cash transaction reporting.

defendants who have fled while on bond for fraud charges, including recent examples involving defendants across the country.[7] Walking across the border to Mexico involves no checkpoints at all: "[i]t is possible to flee the United States without a passport." *See* Transcript of Detention Hrg., *United States v. He,* No. CR 24-00329 CRB, ECF No. 36 at 37 (Hixson, J.).

### III. The Defendant Poses an Economic Danger to the Community and his Ongoing Possession of Firearms Poses Some Risk of Physical Danger.

The defendant's release would also pose a significant threat to the community. This is because Mattson poses an economic danger to the community that is not currently mitigated. Dangerousness within the meaning of 18 U.S.C. § 3142(e) is not limited to violence. It can include financial harms. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Giordano*, 370 F.Supp.2d 1256, 1270 (S.D. Fla. 2005) ("There can be no question that an economic danger, like that posed by a serial defrauder, falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act."); *United States v. Madoff*, 586 F. Supp.2d 240, 253 & n.11 (S.D.N.Y. 2009) (accepting that "in certain circumstances an economic or pecuniary harm may give rise to a consideration of danger" for purposes of pretrial detention and noting that "[t]he question appears to become one of propensity to commit further crimes, even if the resulting harm is solely economic"). Mattson's lengthy history of abusing the trust of his friends and neighbors and parting them from their hard-earned cash gives rise to a concern that he will continue to engage in such behavior. That concern is reinforced by what agents found in Mattson's truck at the time of his arrest: over $9,000 in cash and a new laptop computer together with four separate flash drives, tools of the trade for someone who was soliciting new investor business.

Mattson has a degree in economics and finance. After working as a stockbroker for more than 25 years, he apparently transitioned full time to investment advising and real estate in 2009. According to the Indictment, his scheme began as early as then. Mattson presented himself as a sophisticated

---

[7] For example, in *United States v. Thai*, No. 4:22-cr-329 (S.D. Tex.), the defendant cut her electronic bracelet and fled the country. *See also United States v. Terabelian*, 105 F.4th 1207, 1214-17 (9th Cir. 2024) (defendant in bank-and-wire fraud case removed electronic monitoring anklet and fled to Montenegro); *United States v. Guerrero*, 37 F.4th 1215, 1216-17 (7th Cir. 2022) (noting codefendant fled to Philippines after healthcare fraud indictment).

MOT. FOR DETENTION PENDING TRIAL         17
3:25-CR-00126 CRB

financier.  Many investors trusted him implicitly to provide all manner of financial advice.  Mattson's training and experience heightens the economic danger his pretrial release presents.  As described more fully above, Mattson has access to and the ability to dissipate significant resources, the full scope of which are still unknown.  He has also made select payments to particular investors—picking winners and losers—presumably in the hope that they will not cooperate with the investigation.  This heightens his ongoing economic danger to the community, even though the scheme has been uncovered, because his select payments to investors outside of the judicial process create a significant risk of witness tampering and obstruction.

Finally as to the dangerousness point, the government notes that at the time of the execution of the search warrant on the defendant's Sonoma residence on May 24, 2024, several firearms were legally registered to the defendant.  None of them were found during the search.  However, agents did find a tactical vest and body armor in Mattson's closet.  This armor is rated to protect against 7.62 x 39, 7.62 x 51, and 5.56 M855 ammunition—in other words, it is specially designed to protect against rifle rounds.  As of this week, the defendant still is the registered owner of three firearms, the whereabouts of which are unknown.  His continued access to firearms and a bulletproof vest gives rise to concerns about dangerousness, albeit one that may be mitigated.

## CONCLUSION

The Court should find that a detention hearing is required, continue that hearing until at least May 27, 2025, and thereafter enter an order detaining the defendant pending trial.

DATED:  May 22, 2025                                Respectfully submitted,

                                                    PATRICK D. ROBBINS
                                                    Acting United States Attorney

                                                    _____/s/_____
                                                    CHRISTOFFER LEE
                                                    NIKHIL BHAGAT
                                                    Assistant United States Attorneys