| | |
|---|---|
| 1 | CRAIG H. MISSAKIAN (CABN 125202)<br>United States Attorney |
| 2 | |
| 3 | MARTHA BOERSCH (CABN 126569)<br>Chief, Criminal Division |
| 4 | CHRISTOFFER LEE (CABN 280360)<br>NIKHIL BHAGAT (CABN 279892) |
| 5 | Assistant United States Attorneys |

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTOFFER LEE (CABN 280360)
NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>KENNETH W. MATTSON,<br><br>    Defendant. | CASE NO. 3:25-CR-00126 CRB<br><br>**REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION TO DETAIN**<br><br>Date: May 28, 2025<br>Time: 10:30 a.m.<br>Court: Hon. Alex G. Tse |

    At the defendant's initial appearance on May 23, 2025, the Court directed the parties to work constructively towards the negotiation of agreed-upon release terms—the government has worked, in good faith, towards that end. The defendant's opposition, submitted following those discussions, unfortunately does not advance that goal.

    Pretrial Services, after conducting its own investigation, has now found that Mr. Mattson poses a risk of flight and also a danger to the community, albeit one that may be mitigated with conditions.

    This reply brief proceeds in three parts: (1) first, it responds to the most significant, though not all, of the assertions in the defendant's opposition; (2) second, it makes some observations as to the Pretrial Services Report; and (3) third, it serves to update the Court as to the parties' discussions and set forth the government's tentative proposal, having not yet had the benefit of hearing the victim impact

REPLY TO DEF.'S RESP.
3:25-CR-00126 CRB

1

statements and any other information the Court may hear at the detention hearing.

I. **Reply to Defendant's Response**

*First*, it is not true that the "centerpiece of the government's motion" is the cash found at the time of the defendant's arrest. Def. Opp. at 7. The centerpiece of the government's motion is the totality of the defendant's conduct, including a pattern of deception, obstruction, and self-serving half-truths involving a money flow of hundreds of millions of dollars. The cash, found on a random day at approximately 7:30 in the morning, is just one example of the defendant's access to money that cannot be traced by this Court, by the Bankruptcy Court, or by Pretrial Services. Whereas the defendant appears to regard having $9,000 in cash from rents as a mitigating fact, the government views the collection of hard-to-trace cash as precisely the type of access to cash that makes his risk of flight more likely. The government has asked counsel for the addresses of those properties to confirm these assertions—the defendant has refused to answer.

Moreover, the defendant and his spouse have also now <u>extraordinarily</u> refused to answer any of pretrial services' questions about his assets and liabilities—standard financial questions that pretrial services asks any defendant. He claims to pretrial to simply be unemployed—even if it is technically true that he is not a W-2 employee, his apparent continuing role as a landlord, per his counsel, would have impacted Pretrial Services' determination of an appropriate bond. It cannot be said that Mr. Mattson was forthright with Pretrial Services. In a case like this—where the crux of the flight concern revolves around the defendant's access to untraceable or unknown assets—this refusal to cooperate with Pretrial Services reinforces the government's concern about the defendant's access to hidden assets that may aid in flight.

*Second*, the defendant's "refutation" of the government's obstruction evidence is long on outrage, but short on facts. *See* Def. Opp. 9–10. Counsel has told this Court both at the initial appearance and in their opposition that the files were deleted on the same day as Mr. Mattson's lawyers imaged the device to preserve data. Counsel clarified in open court that the data was not deleted on "accident." The purpose of forensic imaging is to preserve data from the original device, not delete the underlying contents. To the extent a forensic image containing Mr. Mattson's deleted files exists, tellingly, the government understands that no such image was ever produced to the SEC, despite the

existence of legal process that would have encompassed production of the very files that were deleted from Mattson's laptop. The most logical explanation is that the defendant deleted the files just before giving the computer to his counsel because he *did not want them to be preserved* to turn over to civil litigants or the government. Despite the government's repeated requests, the defendant has not turned over a copy of the image his counsel have now twice-confirmed exists.

*Third*, counsel represents that they are in possession of certain documents that Mattson has represented as copies of his tax returns. Def. Opp. at 9. The government has no reason to doubt counsel's representation. But that representation does not call into question the government's proffer that the defendant and KS Mattson have not *filed* their federal tax returns. Mattson prepared taxes for many individuals, including many victim-investors. Even assuming that he prepared tax returns for all those years, that does not mean he filed them.[1]

*Fourth*, regarding the -1059 account, there is a difference between the limited ability to write routine checks from an account versus *full access and control* of the account. The evidence will show that Mattson controlled the -1059 account from a P.O. Box. and online banking platform and shielded the hundreds of monthly off-books investor deposits and off-books distribution checks Mattson generated from LM. It was only when LM gained access to, and therefore visibility into, the -1059 account, that Mr. Mattson's scheme ground to a halt—ostensibly when Mr. Mattson was no longer able to recruit fresh investors to pay what old investors were owed. Of the four checks shown in the defendant's own papers, only one is hand-signed—the one signed by Mr. Mattson. The others appear to be computer generated checks for routine services—tellingly, none are investor distributions. Nor did the opposition brief include any number of the *thousands* of distribution checks Mattson signed on his own check stock and sent to off-books investors to lull them into a sense of false security. Finally, even taking the defendant's claims of $15 million more flowing into the -1059 account than flowing out—that argument only follows if -1059 was actually being used as an LM operating account rather than a Mattson slush fund. As noted in the government's detention memo, Mattson used millions of dollars

---

[1] As described in the Indictment, Mattson falsified and caused to be falsified all manner of fake tax forms to perpetuate the scheme, including Form K-1s and Form 1065; the government has no information as to the authenticity of the documents he provided counsel.

from the -1059 account to pay for mortgages on his personal properties and for other personal expenses.

## II. Observations as to the Pretrial Services Report ("Bail Study")

The government takes this opportunity to provide some factual clarifications and observations as to the Bail Study.

*First*, as described above, the government is deeply concerned by the defendant and his spouse's refusal to provide any financial information to pretrial services. In a case such as this, where the animating concern behind the flight risk is the defendant's myriad access to wealth and undisclosed sources of cash, it should give the court great pause when the defendant and his spouse apparently refuse to discuss or provide any information regarding their financial condition with pretrial services. His counsel has represented that she is in possession of Mattson's tax returns but has refused to share them with the government and, apparently, with pretrial services. These documents—which presumably include information about the defendant's income and assets—are presumably very important to the Court's determination of what kind of a bond might appropriately mitigate a risk of flight.

*Second*, the bail study reports that, according to the defendant's spouse and ECF records, Mr. Mattson and his wife have filed for bankruptcy. Bail Study at 2,9. That is inaccurate. Mr. Mattson's creditors have filed an involuntary bankruptcy petition seeking to have him and KS Mattson Partners, LP declared bankrupt; to date, Mr. Mattson has resisted those efforts. Mrs. Mattson is not named in those involuntary petitions.[2] *See generally In re Kenneth W. Mattson*, No. 24-10714 (Bankr. N.D. Cal.); *In re KS Mattson Partners LP*, No. 24-10715 (Bankr. N.D. Cal.).

*Third*, the Bail Study appears to contemplate the posting of personal property ("$10,000 vehicle; $300,000 in vehicles") as security for a bond. The government does not believe that the Clerk has a mechanism to take possession of unsold personal property to secure a bond, and in any case, the fact that vehicles are generally depreciating assets makes them particularly poorly suited to secure an appearance bond. The Court should not consider a bond that includes personal property as security.

---

[2] For the same reason, it is inaccurate to say that the Del Mar property "is presently in the Bankruptcy estate." Def.'s Opp. Ex. B at 3. The Del Mar property is in the name of an LLC controlled by a third party, a third party to which Mr. Mattson transferred the property approximately six weeks after the federal search warrant. And as set forth above, neither Mattson nor KS Mattson Partners has declared bankruptcy, so there is no "bankruptcy estate" to speak of.

REPLY TO DEF.'S RESP.                4
3:25-CR-00126 CRB

*Fourth*, the Bail Study appears to double-count the Reno residence of J.M. and M.M. that the defendant proposes as one of the properties to secure bond. We understand the Zillow estimate of the Reno property to be $506,900. Even if the entire property is owned by J.M. free and clear, that would only secure approximately $506,900 of the bond; in other words, they do not both have $750,000 in real property to post—there is only one property, and it is, at least according to Zillow estimates, worth only $506,900.

*Fifth*, although the Bail Study notes the "assessed value" of the defendant's Sonoma residence at approximately $3 million (i.e. the amount on which he pays property taxes), we note that the Zillow estimate of the property exceeds $7.7 million; in other words, the property is worth more than double that. In light of Proposition 13, it is exceedingly common in Northern California for the assessed value of a property to be dramatically less than the actual value.[3] This property, however, is not suitable to secure the defendant's bond because it is titled in the name of KS Mattson Partners and is thus subject to the Bankruptcy Court's preservation order. *See Preservation Ord., ECF No. 118, In re KS Mattson Partners LP, No. 24-10715 (Bankr. N.D. Cal. May 15, 2025)*.

### III.   The government's tentative proposal and the defendant's position

Even though many of the defendant's properties are subject to a preservation order entered by the bankruptcy court, the government has identified at least one other property that it believes should be posted as security. A residence on LaSalle Avenue in Piedmont, CA is titled in the name of the defendant's spouse alone. That property has a Zillow estimate exceeding $3 million. The defendant's spouse is not subject to the bankruptcy court's preservation order. Given the defendant's spouse is a proposed surety, and has access to this valuable piece of property, using the LaSalle Avenue residence as secured collateral would contribute to Mr. Mattson's compliance with the terms of pretrial release without running afoul of the Bankruptcy Court's orders.[4]

---

[3] For the same reason, the Bail Study's reliance on "assessed value" to determine the value of properties owned by the defendant likely means that it severely undervalues those properties.

[4] By its plain terms, the bankruptcy court's order applies only to Mr. Mattson encumbering property, not his spouse.

REPLY TO DEF.'S RESP.                5
3:25-CR-00126 CRB

The defendant should only be released on the strictest of conditions, and the government's view is that those conditions should include, at a minimum, and subject to such further evidence as may be developed at the hearing:

- A $10 million bond, partially secured by the following:
    - The LaSalle Avenue residence described above
    - The Reno, NV residence described in the Bail Study
    - $100,000 in cash to be deposited by J.M. and M.M.
    - $100,000 in cash to be deposited by R.L.
- The following individuals, identified in the Bail Study, as co-signers and sureties on that bond:
    - S.M.
    - M.M.
    - R.L.
    - H.B.
    - A.M.
- The standard conditions of pretrial release, to include two additional special conditions:
    - The defendant must submit to location monitoring by GPS as directed by Pretrial Services.
    - The defendant shall not engage in any monetary transaction exceeding $5,000 without the express permission of Pretrial Services.

In the government's view, to the extent the Court believes that there are conditions suitable to allow for the defendant's release pending trial, the foregoing conditions are the minimum required to reasonably assure the defendant's appearance at future court proceedings and ensure the safety of the community.

The government understands that the defendant does not object to the individuals signing on the bond or to the GPS monitoring condition but believes that a smaller bond is appropriate and also objects to the posting of the LaSalle property and the proposed restrictions on the defendant's ability to conduct monetary transactions.

The government also respectfully requests that the Court consider the additional victim statements filed today, as well as the oral statements of any victims who wish to speak at the detention hearing, in weighing its assessment of the defendant's risk of flight and his economic danger to the community.

DATED: May 27, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

  */s/*
CHRISTOFFER LEE
NIKHIL BHAGAT
Assistant United States Attorneys