CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTOFFER LEE (CABN 280360)
NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:25-CR-00126 JST (AGT) |
| Plaintiff, | UNITED STATES' RESPONSE TO DEFENDANT'S "STATUS MEMORANDUM" |
| v. | |
| KENNETH W. MATTSON, | Date: June 11, 2025 |
| Defendant. | Time: 10:00 a.m. |
| | Court: Hon. Alex G. Tse |

## INTRODUCTION

The defendant has filed papers titled "Status Memorandum Re. Continued Detention Hearing."[1] But that title is misleading at best. The Court has already ruled on the government's motion for pretrial detention and decided the conditions upon which defendant Mattson is to be released pending trial. The Court set a further hearing to determine the scope of two conditions: that which required Mattson to notify Pretrial Services of certain financial transactions and that which precluded him from acting in a fiduciary capacity.

Rather than address the issues the Court asked the parties to consider for the hearing on June 11,

---

[1] The minute order from the May 28, 2025 detention hearing reflects that the June 11 date is set for a status conference as opposed to a "continued detention hearing." ECF No. 21.

RESP. TO DEF. STATUS MEMO      1
3:25-CR-00126 JST (AGT)

Mattson's filing is a transparent attempt to distract the Court with a manufactured dispute about an issue that does not bear on mitigating the defendant's flight risk and danger to the community. The real purpose of Mattson's filing is to avoid abiding the Court's order to post the Piedmont property—the only property that has substantial equity—to secure the defendant's bond. This is a red herring, and the Court should not take the bait.

At the May 28, 2025 detention hearing, the Court asked the parties to be prepared to address two issues at the June 11, 2025 status conference—namely, Pretrial Services' recommendation of a no-fiduciary condition and the issue of how best to monitor Mattson's spending to mitigate his risk of an economic danger to the community. Strangely, the defendant's memorandum, filed two days before the hearing, does neither. Instead, it spends five pages quibbling over whether files were just placed in the defendant's recycle bin or placed there and then deleted, asking the magistrate judge overseeing the bail proceedings to order discovery, and asking for a delay in the proceedings, "before additional conditions of this bond are posted," Def. Mem. at 4,—in other words, before the defendant's wife posts the Piedmont property. In so doing, it tellingly fails to cite to a single case or a single statute.

The defendant is wrong on the merits. But even if he were not, this is an obvious sleight of hand: the question of whether the government can prove beyond a reasonable doubt that the defendant obstructed justice—*i.e.* altered or deleted files with the intent to obstruct an investigation—is one for trial. It is not relevant to the question before the Court—fashioning conditions that will reasonably assure the defendant's appearance as required and the safety of the community—and is certainly no basis for a continuance of the hearing. The defendant's last-minute attempt to continue the hearing is nothing other than an attempt to distract the Court from the fact that he has, to date, failed to take any substantial steps to post the Piedmont property with the Clerk of the Court. The Court should focus the hearing on the issues that matter.

## PROCEDURAL HISTORY

**I.     The Criminal Proceedings**

On May 13, 2025, the grand jury returned an Indictment charging the defendant with seven counts of wire fraud, one count of money laundering, and one count of obstruction of justice. The

1  defendant was arrested on May 22, 2025 and appeared before the Court on May 23, 2025. At the initial
2  appearance, after hearing lengthy argument, the Court found that the government was entitled to a
3  detention hearing and remanded the defendant into custody. On May 28, 2025, the Court held a several-
4  hour detention hearing where nine victims spoke at length about the impact of Mattson's crimes and the
5  economic damage to them and their communities; at the conclusion of that hearing, the Court released
6  the defendant on a $4 million bond *contingent on* the posting of two real properties with the Clerk of
7  Court by June 11, 2025. As of this writing, the defendant has not posted either of those properties.[2] At
8  the conclusion of the detention hearing, the Court also set a further hearing to discuss two conditions:
9  that which required notification to pretrial services in conjunction with engaging in any financial
10 transaction over $5,000, and that which would preclude the defendant from acting in a fiduciary or
11 financial capacity while he is on pretrial release.

## II.     The Bankruptcy Proceedings

As of the May 28, 2025 detention hearing, the defendant and KS Mattson Partners, LP were both in involuntary bankruptcy proceedings and both resisting efforts to put them into bankruptcy. And as Bankruptcy counsel clarified at the hearing, the defendant is *not* currently subject to a $15,000 limit on his personal financial transactions. Rather, as the parties and the Court learned at the detention hearing, the Bankruptcy Court has ordered him to comply with Sections 363 and 364 of the Bankruptcy Code. Preservation Order Under 11 U.S.C. § 303(f), ECF No. 91, *In re Mattson*, No. 24-10714 (Bankr. N.D. Cal. May 11, 2025). That simply means that he may not engage in any transactions "other than in the ordinary course of business" 11 U.S.C. § 363(a), and it allows him to "obtain unsecured credit and incur unsecured debt in the ordinary course of business." 11 U.S.C. § 364(a).[3]

---

[2] The defendant claims that he has posted the Reno property, Def. Mem. at 4 n.3, but there is no such indication on the docket.

[3] At the detention hearing, Mattson's counsel represented that they believed that the Bankruptcy Judge's order precluded Stacy Mattson from posting the Piedmont property, despite the fact that she owned it in her own name. Whether that is true is unclear. What is true is that the Bankruptcy Court's docket does not reflect any attempt by Mattson to ask that court for permission to post the property here. Moreover, according to Creditors' Counsel, Mattson has not so much as broached the subject with them, despite being in significant other discussions about bankruptcy matters, to include the appointment of Ms. Itkin, discussed *infra*.

On June 9, 2025, the Bankruptcy Court entered a stipulated order, prepared by Mattson's counsel, that placed KS Mattson Partners, LP into Chapter 11 bankruptcy proceedings. Stipulated Ord. for Relief in an Involuntary Case, ECF No. 131, *In re KS Mattson Partners LP*, No. 24-10715 (CN) (Bankr. N.D. Cal. June 9, 2025), attached as Ex. A. Importantly, the Court appointed an independent director—Robbin Itkin—to "solely be responsible for the duties and obligations of [KS Mattson Partners]" and vested her "with the authority to operate [KS Mattson's] business." *Id.* at 2. In seeking the Order, Ms. Itkin told the Bankruptcy Court that she intended to hire a third party to serve as KS Mattson's Chief Restructuring Officer, "with primary responsibility for managing [KS Mattson]'s real estate portfolio, including rent collection, property oversight, asset preservation, analysis and implementation of asset sales and potential financing opportunities." Decl. of Robbin L. Itkin in Supp. of Debtor's Mot. for Ord. Authorizing Designation of Robbin L. Itkin as Responsible Individual Pursuant to B.L.R. 4002-1 at 5, ECF No. 134, *In re KS Mattson Partners, LP*, No. 24-10715 (CN) (Bankr. N.D. Cal. Jun. 9, 2025), attached as Ex. B. Moreover, she told the Court before it ruled that she sought authority to have the third party "collect rents, manage the property portfolio, and perform basic financial functions, including schedules and statements." *Id.* In summary, Mattson himself is still not in bankruptcy, but KS Mattson Partners is now in Chapter 11 proceedings and is or is imminently to be under the control of Ms. Itkin.

## DISCUSSION

**I.    The Financial Notification Condition is Modest, Not Overly Burdensome, and Would Serve to Mitigate the Defendant's Risk of Economic Danger to the Community.**

The defendant is charged with a massive Ponzi scheme; the government is concerned about his unaccounted-for assets, about which he refuses to answer any questions, and the Court has previously indicated that it too is concerned about the defendant's economic danger to the community. This concern is heightened now that the parties know that the defendant is no longer subject to a $15,000 transaction limit in the Bankruptcy Court.

The relief the government initially requested—seeking permission for any transactions exceeding $5,000—was itself modest. The Court's revision to that request—requiring the defendant to notify pretrial services within 24 hours of such transactions—was even more solicitous of the defendant's need

to engage in ordinary financial transactions during pretrial release. Indeed, under similar circumstances, many federal courts have imposed conditions *prohibiting* a defendant from engaging in financial transactions above a certain dollar amount—and in those cases, the limits were set well south of $5,000.

For example, in *United States v. Rossini*, Case No. 1:15-cr-515 (N.D. Ill.), the defendant was charged with several counts of wire and mail fraud for "engaging in a multi-year real estate fraud investment scheme that . . . [defrauded] victim investors of approximately $2.9 million in a Ponzi-type scheme." ECF No. 108 at 9. In releasing the defendant on bond, the magistrate judge initially ordered that the defendant not engage in any financial transactions more than $500. *Id.,* ECF No. 38. In *United States v. Damante*, the defendant was charged with wire fraud for soliciting investments from victims and instead using those funds for his personal benefit. The Court included the following condition as part of his bond:

> Defendant shall not enter into any financial accounts to include bank accounts, money market accounts, stock accounts, credit union accounts, and credit card accounts, and shall also not enter into any financial obligations to include secure transactions, purchase agreements, any financial applications in excess of $1,500, with the exclusion of appropriate legal defense expenditures, without prior notification and approval of Pretrial Services.

No. 2:11-cr-00064-MMD-CWH, 2012 WL 5288001, at *2. The court subsequently added conditions that the defendant "enter into financial transactions in his own true lawful name and must gain approval from the Court, and not Pretrial Services, before entering into any financial obligation over $1,500." *Id.* at *3. *See also* 2021 WL 3012087 (magistrate judge's order revoking bond).

In *United States v. Boutros*, the defendant faced wire fraud and identity theft charges. The magistrate judge ordered the defendant, as a special condition of pretrial release, not to conduct any financial transaction over $1000 without pretrial services' approval:

> - DO NOT CONDUCT ANY FINANCIAL TRANSACTION OVER $1000 WITHOUT APPROVAL FROM PSA (EXCEPT FOR MONTHLY CHILD SUPPORT & RENT)

Order Setting Conditions of Release, ECF No. 9, *United States v. Boutros*, Case No. 19-mj-00264 (D.D.C. Oct. 28, 2019). In *United States v. Pollock*, the magistrate judge ordered the following conditions as part of the defendant's bond:

> o The defendant is not to open any new financial accounts or lines of credit without the prior approval of Pretrial Services.

- The defendant shall not engage in any financial transaction over $500.00 without the prior approval of Pretrial Services, including any expenditure authorized by him or paid for his benefit from Cerritos Resort.

Order Setting Conditions of Release, ECF No. 12, *United States v. Pollock*, Case No. 3:14-CR-00186-BR (D. Or. May 13, 2014). In *United States v. Bailey*, the Court imposed the following condition as part of the defendant's conditions of pretrial release:

> No employment w/payment of funds or cash. Do not enter into any financial transactions concerning any transaction listed on the Bill of Information. Do not enter into any financial transactions amounting in more than $500.

*United States v. Bailey*, No. 1:11 CR 10, 2012 U.S. Dist. LEXIS 39689 (W.D.N.C. Mar. 23, 2012).

Courts in this district, too, have ordered similar conditions. In *United States v. Brugnara*, Judge Alsup and Judge Cousins imposed the following release condition based on Pretrial Services' recommendation:

> The defendant shall not engage in or attempt to engage in any financial transactions either directly or indirectly through third parties (e.g., his wife or other family members). He may not submit any applications or requests for loans, personal or business. He may not possess any credit cards, bank cards or any other financial access devices. He may not possess checks of any kind (e.g., personal, business, travelers'). He may not have more than $20 in his possession at any time.

*See* Amended Order Denying Mot. to Revoke Detention Ord., *United States v. Brugnara*, Case No. 08-00222 WHA, 2014 WL 5306784, at *3 (N.D. Cal. Oct. 17, 2014). *See also* Ord. Re Mot. to Revoke Pretrial Release; Modification of Pretrial Release Conditions at *7, *United States v. Benson*, No. 12-CR-00480 (N.D. Cal. June 13, 2014) (Westmore, J.) (ordering defendant, as condition of pretrial release, to comply with financial restrictions in related civil case, including that he not withdraw, remove, dissipate, or dispose of any funds deposited in any financial institution). The Court should not disturb the condition that requires the defendant to notify Pretrial Services within 24 hours of conducting any financial transaction exceeding $5,000.

## II. The Court Should Impose a Version of the "No Fiduciary" Condition Recommended by Pretrial Services to Mitigate the Defendant's Economic Danger to the Community.

At the detention hearing, Pretrial Services asked the Court to impose the following condition: "Defendant is prohibited from acting in a financial or fiduciary capacity for any individual or entity." The defendant resisted this condition, claiming that he was still a partner in KS Mattson Partners, LP, a

going concern, and needed to be free to manage it. Ultimately, the Court entered an order precluding the defendant from "act[ing] as a financial fiduciary" and precluding him from soliciting or obtaining any new investments. *See* Conditions of Release and Appearance, ECF No. 23, at 1. For the following reasons, the government respectfully requests that the Court amend these conditions to read: "The defendant shall not solicit or obtain money from any investors, directly or indirectly, and shall not maintain or accept any employment or position in which he would be in a fiduciary position or in a position to manage the finances of others."

First, such a condition is necessary to protect the community. The Indictment alleges that the defendant, over the course of more than a decade, took advantage of the trust of hundreds of victims to induce them to give him millions of dollars, which he used for things other than what he promised. Even after his scheme began to unravel in late 2023, he continued to solicit investments and assure existing investors that their funds were safe. The Court should protect the community—including putative future investors and those who might otherwise trust Mattson with their money—by precluding him from acting in a fiduciary or financial management capacity.

Second, the defendant's sole purported reason for resisting this condition—that he needed to manage KS Mattson Partners and its real estate properties—no longer exists. KS Mattson Partners is now in bankruptcy and is, or shortly will be, under the control of an independent director, Robbin Itkin, and the professionals she will retain to conduct the day-to-day affairs of the business. Mattson will play no active or passive role in the operation of KS Mattson Partners. He has no legitimate reason for wanting to be a fiduciary.

Third, courts across the country have imposed such conditions. In *United States v. Smith*, the Court released the defendant, who was charged with tax offenses, on a condition that he "not maintain or accept any employment in which you would be in a fiduciary position." *See* Order Setting Conditions of Release, ECF No. 17 at 3, Case No. 16-CR-2002 (N.D. Iowa Jan. 26, 2016). In *Rossini*, described above, the magistrate judge ultimately ordered a bond that included conditions that the defendant "(1) not directly or indirectly solicit money from individual investors, nonprofit investors, family trusts, or closely held corporations with less than five shareholders; and (2) seek Court approval before any additional monies were solicited for or invested in properties that Rossini owned or that predated the

Indictment." ECF No. 86 at 2-3.  In *United States v. Reese*, the district court, in overruling the magistrate judge's detention order, imposed, among other things, a condition that the defendant "must not be employed in any position of fiduciary responsibility." Case No. CR 11-2294 RB, 2012 WL 13081251 at *3 (D.N.M. Feb. 24, 2012).  And in *United States v. Walker*, the Court imposed a special condition of release that read: "Defendant shall not engage in any activities that involve the exercise of fiduciary duties in connection with raising funds on behalf of any entities, including public or private entities." Case No. 13-mj-544, 2013 U.S. Dist. LEXIS 190129, at *4–*5 (D. Minn. Sept. 5, 2013). Contrary to the defense's suggestion at the detention hearing, this Court would not be the first to impose such a condition, and it is entirely appropriate given the nature of the offense here.

### III. The Government Has No Obligation to Prove its Case at This Juncture, the Issue of Deleted Files is Irrelevant to the Court's Determination of the Two Conditions, and in Any Case, the Defendant is Misreading the Report.

While the Court's determination of whether the case involved a "serious risk that [the defendant] will obstruct or attempt to obstruct justice," 18 U.S.C.§ 3142(f)(2), was relevant to its determination of whether to *hold* a detention hearing in the first place, that time has passed. "[O]nce the detention hearing is triggered by (f)(1) or (f)(2), Section 3142(e) necessarily requires the court to consider whether the defendant presents a risk of nonappearance or danger to the community and whether there are conditions that can mitigate those risks." *United States v. Spirea*, No. 3:24-cr-00383-2-AN, 2024 WL 4903759, at *1 (D. Or. Nov. 27, 2024).

And the Court has done that.  It held a fulsome, multi-hour detention hearing on May 28, 2025, where it heard the evidentiary proffers and arguments of counsel, considered the pretrial services report and the position of pretrial services, heard from and considered the impact to victims, and even heard from lawyers in the Bankruptcy litigation.  After analyzing the relevant factors under Section 3142, it released the defendant on a partially secured bond pursuant to certain conditions—conditions that the defendant, as of this writing, has not yet met, and appears intent on evading.  *See* Def. Mot. at 5 (requesting continuance and demanding a forensic image of the defendant's laptop "before additional conditions of this bond are posted").

The defendant's incredulous claim that because he has not yet received a full forensic image of his computer—less than 10 days after demanding it—has "deeply hindered [his] ability to counter the

government's only basis for a substantial bond and other conditions of release," Def. Mot. at 3, is unmoored from the relevant legal principles. The May 22, 2024 deletion of files was one basis for the government's claim that a detention hearing was warranted in the first place, but now that that hurdle has been cleared, it has little to do with whether a bond is $4 million or $10 million and is partially or fully secured. The defendant's hyperfocus on his own (inaccurate) reading of the forensic report is simply not helpful to the Court's determination of risk of flight or danger to the community generally and has even less relevance to the issues the Court left open for a June 11 hearing: how to best monitor the defendant's large financial transactions and the circumstances under which it would impose the "no fiduciary" condition.

### IV. The Defendant's Counsel Are Misreading the Forensic Report.

The defendant's unsupported allegations about the computer forensic report are not only irrelevant to the Court's determination at this stage; they are patently wrong. First, the written report of examination to which counsel refers is only part of the forensic examiner's interim report. Importantly, the report includes and references a digital component—which includes a spreadsheet of the file names that were deleted from the computer, as well as reports from the examiner's use of commonly used forensic tools, like Magnet Forensics Axiom, FTK Lab, and Zimmerman Tools. It also includes forensic artifacts—i.e. the result of the forensic examiner's (largely unsuccessful) attempt to recover some of the deleted files.[4]

But even the written report does not say what Mattson says it does.

With respect to the defendant's computer itself—which is identified in the report as SVE067236—the examiner determined that the only user-created Windows user account was mrskw. Windows registry data showed that user's name to be "k mattson." It was also associated with the Internet user name mrskwm@hotmail.com. Report at 2–3. That is Mattson's email address.

---

[4] At the detention hearing, defense counsel tried to make a dramatic show of a screenshot of a file folder that showed three of the file names that the government had represented as deleted. But the folder he showed the Court was the "Attachments" part of a report from the forensics tool Magnet Axiom. Those attachments were remnants of artifacts of deleted files that the software attempted to recover; it was unsuccessful in doing so, however, as counsel would have known had he simply attempted to open any of the files he displayed.

RESP. TO DEF. STATUS MEMO                        9
3:25-CR-00126 JST (AGT)

The examiner identified several subfolders within the $Recycle.Bin folder, including one associated with the defendant's username. Report at 3. He found that a folder on the Desktop of the defendant's C drive (i.e., the hard drive of the computer) was "recycled"—that is, emptied or deleted from the Recycle Bin—at approximately 2:01:56 p.m.[5] If the defendant had simply placed the files in the Recycle Bin and not emptied it, the examiner would have expected to find the files in the "$R4ISJ6X" subfolder. But instead, as the examiner notes, "I found the $R4ISJ6X folder empty," *id.* at 4, leading to the conclusion that the files were actually deleted from the recycle bin.

The examiner explained that in certain situations, using forensic tools, he may be able to even recover files that are deleted from the recycle bin ("Upon *removal* from the Recycle Bin, files and folders are deleted but may still be recoverable"). *Id.* at 4. But he surmised that the particular file system—NTFS—and the fact that the computer had been powered on for a long period of time before he was able to image it—contributed to why he was unable to recover those files.[6]

Using a different forensic tool, the examiner assessed the computer's master file table (MFT), which stores "information about every file within a storage volume" and "tracks deleted files to potentially allocate that data storage space with a new file." *Id.* at 5. From the MFT—*i.e.* the table that tracks deleted files—the examiner found that approximately 10,120 files had been deleted from the Recycle Bin. *Id.* at 5 ("I then searched for the following recycle bin value: [Recycle Bin subfolder associated with the mrskw user name]. The result was approximately 10120 entries."). The examiner also found that approximately 4,070 other files had been deleted but was unable to determine where those files were deleted from. *Id.* ("I then search[ed] for the spreadsheet for *PathUnknown* values. The result was approximately 4070 entries"). A list of those deleted files was saved to a spreadsheet that has been provided to Mattson's counsel.

---

[5] The defendant's bald, unsupported contention that the files came from an external drive seems to be based in the fact that the file folder was *named* "E Drive." But the full path of the deleted folder—**C:\Users\mrskw\OneDrive\Desktop\E drive**—makes it clear that the folder was located on the *C* Drive—in other words, the computer's main hard drive. Report at 4.

[6] The fact that the defendant's computer contained a newer Solid-State Drive (SSD) as opposed to the Hard Disk Drive (HDD) may have also made it more difficult for the examiner to recover the contents of deleted files.

RESP. TO DEF. STATUS MEMO                 10
3:25-CR-00126 JST (AGT)

**V.     The Government Has Exceeded its Discovery Obligations in this Case.**

As set forth above, counsel's creative—but incorrect—reading of the forensic report is irrelevant to the questions before the Court. But in any case, far from "playing games" with discovery, the government has already produced discovery in this case that far exceeds its obligations. First, 22,000 pages of discovery was produced prior to Indictment. Second, the weekend after initial appearance, the government produced another 19.5 gigabytes of discovery, consisting of 3,000 pages and the full written and digital interim computer forensic report. And since then, the government has produced another 686 gigabytes—more than a million pages—of additional discovery. Finally, the government began the process of reproducing a forensic image of the defendant's computer within 24 hours of receiving a blank hard drive from the defendant's counsel.

## CONCLUSION

The defendant's filing simply attempts to distract from the real issue—his apparent determination not to abide by the property conditions of his bond. The Court should impose the two conditions as described above and require the defendant to post both the Piedmont and the Reno property by June 11, 2025—as he has already been ordered to do.

DATED: June 10, 2025                                  Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_/s/_
CHRISTOFFER LEE
NIKHIL BHAGAT
Assistant United States Attorneys