1 | CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

2

3 | MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

4 | NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorney

5

6 | 450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

7 | Telephone: (415) 436-7193
FAX: (415) 436-6982
nikhil.bhagat@usdoj.gov

8

Attorneys for United States of America

9

10 UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

11

OAKLAND DIVISION

12

13 | UNITED STATES OF AMERICA,                    ) Case No. 4:25-CR-126 JST
                                                )
14 |          Plaintiff,                         ) **UNITED STATES' RESPONSE IN OPPOSITION**
                                                ) **TO DEFENDANT'S MOTION TO AMEND**
15 |    v.                                       ) **CONDITIONS OF RELEASE**
                                                )
16 | KENNETH W. MATTSON,                          )
                                                ) Hearing Date:  January 9, 2026
17 |          Defendant.                         ) Hearing Time: 9:30 a.m.
                                                ) Before:        Hon. Jon S. Tigar
18 |                                             )
   |_____)

19

20        Defendant Kenneth W. Mattson has filed what he styles as an "appeal from magistrate's order,"

21 ECF No. 151, his sixth bail-related motion since the detention hearings in this case.  As the defendant

22 acknowledges, over a total of four hearings, the magistrate judge conducted lengthy proceedings in this

23 matter, considered the relevant statutory factors, and carefully crafted conditions to ensure the

24 defendant's pretrial release while mitigating his risk of flight and danger to the community.  The

25 defendant now asks this Court to be the first in history to find that a federal magistrate judge's financial

26 conditions of release violate the Eighth Amendment's Excessive Bail Clause.  The Court should decline

27 that invitation, construe Mattson's papers as a motion to amend conditions under 18 U.S.C.

28 § 3145(a)(2), and deny the motion.

1

**<u>TABLE OF CONTENTS</u>**

2  RELEVANT FACTUAL AND PROCEDURAL HISTORY ................................................1

3  I.    The Indictment and Mattson's Attempts to Obstruct Justice ................................1

4        A.    The Indictment ..........................................................................................1

5        B.    Evidence of Attempts to Obstruct Justice and Dissipate Assets ............2

6  II.   Initial Appearance and the Government's Motion to Detain Pending Trial .........5

7  III.  The Bail Study ....................................................................................................6

8  IV.   The Government's Bond Proposal and the Initial Detention Hearing .................7

9  DISCUSSION ......................................................................................................................11

10  I.   Record Before the Magistrate Judge and Legal Standards .............................11

11  II.  No Court Has Ever Found a Financial Condition of Release to Violate the Eighth
    Amendment, and Mattson's Bail is Not Unconstitutionally Excessive. ....................15

13  III. The Magistrate Judge Correctly Concluded That the Present Bond Conditions Were
    the Least Restrictive Requirements to Mitigate the Defendant's Risk of Flight and Danger to
    the Community ...........................................................................................................17

        A.    The Nature and Circumstances of the Offense and Mattson's Statutory
              Sentencing Exposure Militate in Favor of a Substantial Bond .........................19

        B.    There is Overwhelming Evidence of the Defendant's Guilt.........................19

        C.    The Full Scope of Mattson's Access to Assets is Still Unknown..................21

        D.    The Conditions of Bond Mitigate the Defendant's Economic Danger to the
              Community ..........................................................................................23

        E.    Mattson's Comparison to Two Cherry-Picked Cases is Unhelpful and
              Unavailing ..........................................................................................24

21  CONCLUSION...........................................................................................................25

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*Galen v. Cnty. of Los Angeles*, 477 F.3d 652 (9th Cir. 2007) .......................................... 15

*In re Davis*, 146 F.4th 710 (9th Cir. 2025) .......................................... 14

*In re KS Mattson Partners, LP*, No. 24-10714 CN (Bankr. N.D. Cal.) .......................................... 22, 23

*Kenna v. U.S. Dist. Ct.*, 435 F.3d 1011 (9th Cir. 2006) .......................................... 14

*Stack v. Boyle*, 342 U.S. 1 (1951) .......................................... 17

*United States v. Beaman*, 631 F.3d 85 (6th Cir. 1980) .......................................... 16

*United States v. Burkholder*, 590 F.3d 1071 (9th Cir. 2010) .......................................... 14

*United States v. Cisneros*, 328 F.3d 610 (10th Cir. 2003) .......................................... 19

*United States v. Combs*, No. 1:24-cr-542-AS (S.D.N.Y.) .......................................... 13

*United States v. Diaz-Hernandez*, 943 F.3d 1196 (9th Cir. 2019) .......................................... 13, 24

*United States v. Doby*, 928 F.3d 1199 (10th Cir. 2019) .......................................... 11

*United States v. Ebonka*, 733 F.Supp.3d 967 (D. Nev. 2024) .......................................... 18

*United States v. Fidler*, 419 F.3d 1026 (9th Cir. 2005) (per curiam) .......................................... 15

*United States v. Gardner*, 523 F.Supp. 2d 1025 (N.D. Cal. 2007) .......................................... 15, 16, 17

*United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991) .......................................... 20

*United States v. Giordano*, 370 F.Supp.2d 1256 (S.D. Fla. 2005) .......................................... 13

*United States v. Hudson*, No. 25-CR-349 RFL (N.D. Cal) .......................................... 24

*United States v. Kim*, No. 21-CR-164 (N.D. Cal.) .......................................... 23

*United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990) .......................................... 11, 12

*United States v. Kube*, No. 1:19-cr-00257, 2020 WL 1984178 (E.D. Cal. Apr. 27, 2020) .......................................... 18

*United States v. Lachwani*, No. 3:21-cr-00353 (N.D. Cal.) .......................................... 24

*United States v. Leisure*, 710 F.2d 422 (8th Cir. 1983) .......................................... 16

*United States v. Lynch*, No. 3:18-cr-00577 (N.D. Cal.) .......................................... 24

*United States v. Madoff*, 586 F. Supp.2d 240 (S.D.N.Y. 2009) .......................................... 13

*United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985) .......................................... 13, 16, 18, 19

*United States v. Palermo*, Nos. 20-CR-190-JD, 21-CR-187-JD (N.D. Cal.) .......................................... 23

*United States v. Peeples*, 630 F.3d 1136 (9th Cir. 2010) (per curiam) ............... 16

*United States v. Polouizzi*, 697 F.Supp.2d 381 (E.D.N.Y. 2010) ............... 16

*United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992) ............... 13

*United States v. Riley*, No. 2:12-cr-478, 2014 WL 257863 (D. Nev. Jan. 22, 2014) ............... 11

*United States v. Salerno*, 481 U.S. 739 (1987) ............... 15, 17

*United States v. Torres*, 566 F.Supp.591 (W.D. Tex. 2008) ............... 16

*United States v. Townsend*, 897 F.2d 989 (9th Cir. 1990) ............... 19, 22

*United States v. Turner*, 367 F. Supp. 2d 319 (E.D. N.Y. 2005) ............... 14

*United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ............... 14

**FEDERAL STATUTES**

18 U.S.C. § 1343 ............... 1

18 U.S.C. § 1519 ............... 1

18 U.S.C. § 1957 ............... 1

18 U.S.C. § 3142(g) ............... 6, 13, 26

18 U.S.C. § 3553 ............... 26

18 U.S.C. § 3771 ............... 14, 15

**STATE STATUTES**

Cal. Corp. Code §§ 15900–15912.07 (2024) ............... 1

**FEDERAL RULES**

Fed. R. Evid. 801(d)(2) ............... 20

**OTHER AUTHORITIES**

131 Cong. Rec. S00000-12, 1985 WL 707152, 53 ............... 13

S. Rep. 98-225 at 3185–86 ............... 16

1           **RELEVANT FACTUAL AND PROCEDURAL HISTORY**

2 **I.     The Indictment and Mattson's Attempts to Obstruct Justice**

3       **A.     The Indictment**

4       On May 13, 2025, a federal grand jury in the Northern District of California returned an

5 indictment charging the defendant with seven counts of wire fraud in violation of 18 U.S.C. § 1343, one

6 count of money laundering in violation of 18 U.S.C. § 1957, and one count of destruction of records in a

7 federal investigation (obstruction of justice), in violation of 18 U.S.C. § 1519. *See* Indictment, ECF No.

8 1 ("Indictment"). The indictment sets forth detailed factual allegations regarding the scheme and the

9 allegations against the defendant. *See id.* at ¶¶ 1-43.

10       For at least 15 years, Mattson was the President of LeFever Mattson ("LM"). LM invested in

11 real estate using subsidiary limited partnerships. In the ordinary course, LM served as the general

12 partner of these limited partnerships and solicited investors to invest in the properties by becoming

13 limited partners.[1]

14       In essence, the Indictment alleges that for more than a decade, Mattson engaged in a massive

15 fraud scheme in which he obtained money from victims who believed they were investing in legitimate

16 LM-backed and LM-managed limited partnerships and provided the investors with false documents and

17 records to make them believe his fiction. In truth, these investors never actually held interests in real

18 property, and never had the right to collect rents or sale proceeds from those properties. To the extent

19 that Mattson ever paid the promised distributions to these "off-books" investors, that money did not

20 come from the rents of the underlying property owned by the specific LM limited partnerships, as

21 Mattson had promised; rather, it came from a hodgepodge of comingled funds, including funds from

22 new investors, in the manner of a Ponzi scheme. Separately from the detailed allegations in the

23 Indictment concerning LM partnerships, investors have reported that they were also defrauded by

24 Mattson via investments with a separate Mattson-controlled investment firm, KS Mattson Partners, LP

25 (KSMP): Mattson told these investors they were investing in shares of limited partnerships or other

26 investments that owned specific pieces of property, but he in fact used their money for unrelated

27

28         [1] Under state law, a general partner is responsible for the day-to-day operations of the business, while limited partners are simply investors. *See generally* Cal. Corp. Code §§ 15900–15912.07 (2024).

business ventures and personal expenses.  *See* Indictment ¶ 5.

An analysis of just three accounts controlled by Mattson—the -1059 LM account referenced in the Indictment, a KSMP operating account, and an account in the name of a Central Valley mobile home park, reveals that between 2019 and 2024, these three accounts alone had total debits of approximately $346 million and total credits of $341 million.  Indictment ¶ 40.

These accounts comingled investor money, rents and proceeds from unrelated properties, and other large deposits, while debits from the accounts included Ponzi-like distribution payments and funds for Mattson's own benefit and personal expenses.  A preliminary analysis identified millions of dollars in personal expenses, including $4 million in credit card payments Mattson paid from those three accounts during that five-year period.  That same analysis has identified that Mattson used at least $11 million from the -1059 LM account, in which he primarily deposited off-books investors funds, to fund personal mortgage payments on Mattson-owned properties in Del Mar, Sonoma, and Piedmont.

**B.**     **Evidence of Attempts to Obstruct Justice and Dissipate Assets**

In addition to his multi-million dollar fraud, Mattson has a history of willfully ignoring financial reporting or filing obligations:  Mattson was a registered tax preparer for more than 10 years, and regularly prepared and filed income tax returns on behalf of LM, its subsidiary limited partnerships, and numerous individual victim investors.  Yet IRS records show that Mattson and Mattson's KSMP entity have failed to file their own federal tax returns since at least 2017.

There is substantial evidence that Mattson has already obstructed justice, and the indictment charges an episode of obstruction directly related to the charged conduct and the victim investors.  As the government has described elsewhere in this litigation, a forensic examination of electronic devices seized pursuant to a search warrant revealed that on May 22, 2024, Mattson deleted more than 10,000 files from the "Recycle Bin" of his laptop computer.  Another approximately 4,000 files were deleted from unknown folders at approximately the same time.

This document deletion occurred after Mattson had engaged counsel, after he had learned that LM had reported him to federal criminal authorities, and after he had been placed on notice of an SEC investigation, warned in writing to preserve all relevant documents, and served a subpoena seeking these documents.  A copy of that subpoena was later found in his home.  As the Court knows, the file names

of the deleted files tend to show that the overwhelming majority of them are relevant to Mattson's solicitation of investor money and his operation of limited partnerships. *See* Ex. 2 to Decl. of SA Rachael Grace ISO U.S. Opp. to Def.'s Mot. to Quash, ECF No. 124.

On the same day the files were deleted from Mattson's computer, he obtained a new cellular phone, and that same evening, footage from surveillance cameras in his residence captured Mattson and his wife/custodian removing trash bags full of unknown materials from their Sonoma residence. At one point, Mrs. Mattson appeared to have remembered the camera's presence and placed an object over it. *See* Gov't Mot. to Detain, ECF No. 6 at 8 (screenshots from surveillance footage).

Two days later, on May 24, 2024, federal agents executed a search warrant at that Sonoma residence. Although they found Mattson's electronic devices, which had been wiped of substantial evidence, it is notable what they did not find: no significant quantity of cash, jewelry, or cash equivalents, notwithstanding millions of dollars used to purchase personal expenses and pay for credit card bills over the past five years. Nor did agents find the multiple firearms registered to Mattson.

The government later learned that Mattson and his wife knew beforehand that federal law enforcement was planning to execute a search warrant at their home in May 2024. In preparation for the search warrant, Mattson and his wife began to sell off assets, including personal luxury goods, as part of one witness called an attempt to "dissipate and hide their assets from the FBI." Aiding in this effort was Jennfer McCarthy, the owner of the Reno property that has been posted to partially secure Mattson's bond. Additionally, according to witnesses, McCarthy set up a secret bank account in her own name for Stacy Mattson so Stacy would have money "stashed away" in case Mattson went "away forever" when the FBI came.[2] In addition to selling off assets, the Mattsons gave their guns and some other valuable assets to McCarthy to store in Reno. *See* Ex. L to Decl. of AUSA Christoffer Lee, ECF No. 51 (filed under seal). And McCarthy herself confirmed the essential facts of these witness accounts. *See* Ex. 3 to Gov't Opp. to Def.'s Motion to Reopen Detention Hearing, ECF No. 90-3 (filed under seal).

In addition to the deletion of thousands of files from the computer, there is other evidence that Mattson sought to obstruct the investigation. Mattson used a cloud-based filesharing service for his LM-

---

[2] Mattson's initial financial declaration to this Court omitted any mention of this account. *See* ECF No. 44-1.

related work, including to communicate with investors and his assistant, and work on investors' tax returns.  Records from that cloud filesharing service show that on May 23, 2024—the day after the files were deleted from Mattson's computer and the day before federal law enforcement searched his house—Mattson deleted two files or folders from that account, within minutes of one another.  Significantly, prior to that date, despite regular use of the account, the last time Mattson had deleted anything was 2022—well before his scheme became known to LM or the authorities.

Additionally, on March 15, 2024, more than 16,000 files were deleted from the cloud filesharing service account associated with an email address used by a Mattson family member.  March 15, 2024 is significant because in the hours before the files were deleted, Mattson had an in-person meeting with an LM representative, wherein they discussed, among other things, Mattson's "off books" activities, and the representative told Mattson that people were using words like "fraud" to describe his actions.  Prior to March 15, 2024, the last time anything had been deleted from that account was 2022.

Following the search warrant execution, Mattson attempted to re-enter properties he recently sold to remove art.  In May 2024, Mattson, through KSMP, sold approximately 13 properties to new owners.  In an episode in June 2024, weeks after escrow had closed, Mattson and a family member returned to the Sonoma's Best Mercantile, a property they had sold, on a Sunday, when it was closed and they likely assumed no one would be present.  They used a key to enter through a rear door and started removing artwork from the walls.  One of the new owners, who observed the break-in from a remote video feed, called the Sonoma County Sheriff.  Deputies responded and required that the Mattson leave the artwork at the property.  The new owners also told at least one witness that Mattson had engaged in similar behavior—taking things that no longer belonged to him, long after he had sold the property—at the Sonoma Cheese Factory.

Despite pleas from investors beginning him to return their money, and during the federal investigations of his schemes, Mattson continued to conduct millions of dollars worth of transactions. Between August 2024 and February 2025, Mattson, with McCarthy's help, received over $2.9 million from the sale of approximately 40 classic cars.  *See* U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint, ECF No. 51, at 8.  In what appears to be another attempt to conceal assets from the government and creditors, the two vehicles that Mattson purchased in cash in September 2024 for more

than $180,000, *see id.*, were both titled in Stacy Mattson's name alone and were funded from a bank account that was in her name alone. That bank account was not opened until March 20, 2024—after LM had confronted Mattson with evidence of the fraud and he had signed an indemnification agreement. The Mattson family used that same bank account for substantial transactions, including several high dollar ATM withdrawals of untraceable cash. For example, between April 23, 2024, and May 8, 2024 they withdrew $5,000 in cash in $500 increments. In four separate transactions between June 20 and July 11, 2024, $4,000 in cash was withdrawn from the account. In June and July, they deposited over $80,000 in cashier's checks and processed more than $1,000,000 in what bank records reflect as "requested withdrawals." In July 2024, they wrote a $10,000 check to yet another family member. On September 13, 2024, there was a teller deposit of $100,000. In January 2025, they sent thousands of dollars from that account to the KSMP account.

There is also evidence that Mattson continued to pay a few select investors and lenders in 2024 and through 2025. On May 10, 2024, while other investors were desperately attempting to get any portion of their money back, Mattson wired more than $203,000 to one apparent investor—evidence that he has access to significant funds and is willing to use those funds to gain the cooperation of potential witnesses. And recent public reporting suggests that Mattson continued to solicit investments for longer than previously known, as late as August 2024, after the execution of a search warrant and long after he learned of civil and criminal investigations. *See* Phil Barber, *How a Group of Wronged Ken Mattson Investors Became 'God's Answer to Our Own Prayers*,' THE PRESS DEMOCRAT (Dec. 25, 2025)*, available at* https://perma.cc/G2ML-KN9X.

## II.    Initial Appearance and the Government's Motion to Detain Pending Trial

The defendant was arrested pursuant to an arrest warrant and made an initial appearance before the magistrate judge on May 23, 2025. ECF No. 19 (minute entry). At the hearing, the government moved for the defendant's pretrial detention, citing a risk of flight and an economic danger to the community. *Id.*; ECF No. 6 (written motion for pretrial detention). In moving for pretrial detention, the government cited, among other things, the following: the significant statutory penalties and sentencing guidelines Mattson faces upon conviction, ECF No. 6 at 12–13, the overwhelming evidence of his guilt, *id.* at 13–14, his access to unknown funds, *id.* at 14–15, his attempts to obstruct various legal processes,

1    *id.* at 15–16, and his economic danger to the community.  *Id.* at 17–18.

2         Following a nearly 90-minute initial appearance, the magistrate judge found that the government

3    had met its initial burden to show that there was a serious risk that Mattson would obstruct justice and

4    ordered a detention hearing be held.  Transcript of Initial Appearance, May 23, 2025, ECF No. 118 at

5    58:12–58:18  ("I understand that you disagree . . . with me on whether or not, you know, the deletion

6    happened, who did it, but I find that that's enough.  That's enough for the Government to meet its

7    burden on why it deserves a detention hearing").[3]  Despite his finding that a detention hearing was

8    warranted, the magistrate judge suggested that he believed "the ultimate outcome is that there's got to be

9    conditions here, because I don't–can't imagine there aren't – there's zero conditions.  But I realize that

10   that takes time to get there."  *Id.* at 58:19–58:21.  And in light of the magistrate judge's initial inclination

11   that he could "envision that there are conditions out here," he urged the parties to "get together, work

12   meaningfully on what those conditions can be, and tee up the ones that are truly in dispute."  *Id.* at

13   66:13–66:17.

14   **III.    The Bail Study**

15        At the magistrate judge's direction, Pretrial Services conducted a bail study.  *See* Pretrial

16   Services Report, ECF No 15.  The bail study found that Mattson maintained infrequent contact with his

17   siblings and parents, all of whom reside out of the district.  *Id.* at 1.  Mattson told pretrial services that he

18   owned the property in which he resides, *id.*, which was not true.  Mrs. Mattson told pretrial services that

19   "she and [Mattson] have filed for bankruptcy and their assets are restrained"—another factual

20   inaccuracy.  *Id.*  Both Mattson and his wife refused to tell Pretrial Services anything about his finances.

21   *Id.* at 8.  After conducting an investigation, Pretrial Services made two important findings: (1) the

22   defendant posed a risk of non-appearance based on the nature of the offense and possible significant

23   assets, and (2) the defendant posed a "financial danger to the community."  *Id.* at 10.  But Pretrial

24   Services concluded that those dangers could be mitigated by a combination of release conditions,

25   including a $4 million bond secured by $3.9 million in cash and property.  *Id.* at 11.

26

27   ───────────────────

28        [3] A judicial officer must hold a detention hearing in a case that involves "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."  18 U.S.C. § 3142(f)(2)(B).

**IV.    The Government's Bond Proposal and the Initial Detention Hearing**

Mindful of the magistrate judge's comments at the initial appearance and after considering Pretrial Services' findings and recommendation, the government suggested to the Court that if it were to release Mattson pretrial, it should only do so "on the strictest of conditions," ECF No. 17 at 6, to include a $10 million bond partially secured by a Reno residence owned by the defendant's sister-in-law and Stacy Mattson's property at 210 La Salle. *Id.*

On May 28, 2025, the magistrate judge held a five-hour detention hearing at which he considered, among other things, the oral statements of nine victims and the written statements of over 75. Whether the posting of 210 La Salle in Piedmont ("La Salle") would be a condition of Mattson's release was a significant issue in dispute. *See, e.g.* Tr. of Det. Hrg., ECF No. 97 at 138:1–138:6. The magistrate judge expressed concern about Mattson's assets and what combination of conditions could assure his appearance as required. *See, e.g., id.* at 35:6–35:11 ("If you have questions regarding his assets, which I do, candidly, I do. I do think that is what is going to be what I'm most interested in is how do we satisfy the condition of, you know, he's not depleting assets and is he going to satisfy my threshold to make sure that it will be enough, sufficient that he doesn't violate it"). The magistrate judge also considered Mattson's danger to the community: "The other thing that I heard today from the victims is their security, that they didn't feel safe. And, so, I would like that to be addressed and how the conditions should be fashioned." *Id.* 39:6–39:9. As part of the magistrate judge's consideration of Mattson's economic danger to the community, he expressed interest in "what kind of conditions we – we can consider that would ensure that any kind of [financial] transactions will be monitored, analyzed, and, if necessary, stopped." *Id.* 41:14–41:19. And although the magistrate judge recognized the victims' hurt and their sense of betrayal at Mattson's duplicity, he made it clear that those things did not factor into his bail decision: "The – the other really heavy theme that I heard is betrayal, that the many years that you've ministered with [Mattson] and you've dealt with him and he's betrayed you and your family. I'm afraid that the Bail Reform Act doesn't address that, and I may never be able to do that, quite frankly." *Id.* at 39:20–39:24. The magistrate judge recognized that "the important thing about these conditions and in particular the posting of a bond and the amount of a bond is that it's to provide the moral suasion . . . that he comply with the conditions. The whole purpose for this is to impose

1  conditions that will ensure compliance with him in pretrial, so that he doesn't violate the law and doesn't

2  dissipate assets and so forth." *Id.* 44:16–44:23.  "I just want to get to the point of if there's conditions

3  here that I can fashion that I can mitigate the risk of harm or nonappearance." *Id.* at 65:3–65:5.  The

4  magistrate judge was laser focused on the Bail Reform Act's twin statutory mandates of danger and

5  nonappearance. *Id.* 127:15 –127:20 ("And I'm not just talking about saving assets for potential victims

6  out there, but really it's to ensure compliance, because that's all I can do that this point is to make sure

7  that there's no risk of nonappearance, and there's, you know, no harm to the community.").

8    In discussing the posting of 210 La Salle with Mattson's counsel and why the McCarthys'

9  property alone would not be sufficient to ensure Mattson's compliance, the magistrate judge observed,

10  correctly, "The fact that the bond is going to be tethered to property [in which] he has no interest, he

11  basically has no stake in it other than the reputation.  I mean, if he violates –let's say he flees and all

12  the–all the Government's left with is this property that's not in his name.  They're going to go and get it,

13  but that's providing him no incentive." *Id.* 125:2–125:8.  The magistrate judge reiterated this concern

14  when addressing Mattson's proposed sureties: "How many of you have an interest in the property that is

15  proposed to secure the bond?" *Id.* at 135:17–135:18.  And ultimately, when he concluded that it was

16  important that Mattson post both properties to secure his release, the magistrate judge provided his

17  reasoning: "I'm more interested in those two properties being part of the package to secure whatever the

18  bond amount is . . . . I'm more interested that those properties are part of it so that these three individuals

19  [Stacy Mattson, Jennifer McCarthy, and McCarthy's husband] are financially on the hook to provide the

20  moral suasion to Mr. Mattson." *Id.* at 143:3–143:7.  The magistrate judge explained, "Let me give you

21  my – my very transparent reason why.  I want more people who have a stake in property to be

22  accountable because I'm going to ask them—we can do it now—that they're going to look me in the eye

23  and say, We don't want to lose this property.  We're going to, as a result of being on the hook for this,

24  make sure Mr. Mattson complies with every little itty bitty condition here." *Id.* at 147:15–147:22.  The

25  magistrate judge continued: "And that's the – that's the whole purpose behind this.  It's really –it's – it's

26  –we're not trying to find a way to take your property or to expose it. So, to the extent that's what you're

27  worried about, my hope is that that doesn't happen. But boy, I really hope that as a result of you being

28  on the hook for it, it's going to help me get [Mattson] to comply with these conditions." *Id.* at 147:24–

1  148:5.

2      And the magistrate judge was careful in ensuring that he imposed only the least restrictive

3  conditions: "Just for the people in the audience, this is not, quite frankly, unusual. This is very typical,

4  the amount of work that goes into doing this. So, in order to do it right, it requires this kind of detail and

5  attention to the detail and making sure that we get the arguments on the table." *Id.* at 77:3 – 77:8.

6      As the government explained to the magistrate judge, "We're asking for a $10 million bond,

7  essentially partially secured, and the reason for the $10 million bond is that the cases in this realm talk

8  about bond being high enough that losing it would cause a deeply hurt – a deeply felt hurt to the

9  Defendant. For some people, your honor, $4 million is . . . all the money in the world. It's not the case

10  with this Defendant. And so, the purpose of that amount of bail is to incentivize him to comply with the

11  conditions. It's important for Mr. Mattson [to] know that if he violates the Court's orders, if he violates

12  the conditions . . . that his children will be on the hook for $10 million . . . . It needs to be high enough

13  that . . . . given who Mr. Mattson is and given the amount of money that Mr. Mattson is dealing with, to

14  think twice about violating . . . the conditions." *Id.* at 96:24 – 97:18.

15      Ultimately, the magistrate judge released Mattson subject to the following conditions:

16  • a $4,000,000 bond partially secured by the posting of (1) a property in Reno, Nevada owned

17      by the defendant's sister-in-law, (2) 210 La Salle Avenue in Piedmont; (3) $100,000 in cash

18      from the defendant's sister-in-law and (4) $100,000 in cash from R.L., a friend of the

19      defendant's;

20  • The defendant's daughter, son, sister-in-law, and brother-in-law as sureties;

21  • The defendant's wife Stacy Mattson as a surety and custodian;

22  • Location restrictions, including location monitoring and restriction to the Northern and

    Eastern Districts of California.

23  Order Setting Conditions of Release, ECF No. 23. The magistrate judge ordered that both properties be

24  posted with the Clerk of Court by June 11, 2025. *See id.* at 142–43; ECF No. 23 (order setting

25  conditions of release).

26      On June 11, 2025, the magistrate judge held a further hearing and reaffirmed the previous

27  conditions of release. ECF No. 37 (superseding order setting conditions of release). At the latter

28  hearing, the magistrate judge inquired about the posting of 210 La Salle. The magistrate judge

1   reaffirmed his earlier point regarding the importance of La Salle: "So, his sureties are responsible for the

2   [Reno] property, but he himself [is] not.  There's nothing that links—that ties him to the bond."

3   Transcript of Status Hearing, Jun. 11, 2025, ECF No. 98 at 15:6 –15:8.

4        Mattson acknowledged that 210 La Salle had not been posted and that R.L. had not posted the

5   $100,000 she promised. *Id*. at 21–22.  The government asked the Court to require Mattson to comply

6   with the conditions of his bond and post La Salle.  *See id.* at 28–29.  In successfully convincing the

7   Court that that was not appropriate, Mattson's counsel represented that the only reason for the delay was

8   so Mattson could have his Sixth Amendment challenge heard: "So, what I'm saying is rather than go

9   through the paperwork and then later have to come back and reconfigure everything, what we're saying

10  is we can brief this issue to the Court, and the Court can make a decision, and, because the decision is

11  going to deal with that property . . . that that's something that, you know, we should go ahead and do

12  and get an answer to, and then the Court knows about that property." *Id.* at 33:8–33:15.  Relying on that

13  representation, the magistrate judge allowed Mattson to delay posting the property.  *Id.* at 35:2:35:8 ("I

14  don't want to do that if what Mr. Frentzen's going to put in paper is that it is a violation of the Sixth

15  Amendment").  The parties later stipulated that Mattson's Sixth Amendment claims should be brought

16  to this Court, which subsequently twice denied them.  ECF Nos. 68, 78.

17       On November 30, 2025, Mattson filed a motion to modify conditions of release, asking the

18  magistrate judge to "delete the requirement of posting 210 La Salle in Piedmont."  ECF No. 89 at 1.  The

19  government responded, ECF No. 90, and the magistrate judge held a hearing on October 1, 2025.  The

20  magistrate judge denied the motion, finding that Mattson had not met his burden to reopen the detention

21  hearing.  *See* ECF No. 92.  In doing so, the magistrate judge abstained as to the defendant's argument

22  that making the posting of 210 La Salle a condition of Mattson's bond would violate his Sixth

23  Amendment right to counsel of his choice.  But the magistrate judge expressly found that "[t]he portion

24  of the bond which requires the posting of the property located at 210 LaSalle shall be enforceable when

25  the 6th amendment issue has been resolved."  *Id*.

26       On October 20, 2025, Mattson brought a third motion before this Court, renewing his argument

27  that requiring him to post 210 La Salle to secure his pretrial release would violate his Sixth Amendment

28  right to counsel of choice.  ECF No. 100.  On November 25, 2025, this Court denied that motion, finding

1  that there was "no basis to conclude that the Sixth Amendment prevents a court from imposing financial

2  conditions for pretrial release that encumber assets that a defendant might otherwise use to hire

3  counsel." ECF No. 122 at 3.

4        Undeterred by the Court's order, Mattson again returned to the magistrate judge on December 4,

5  2025, bringing a nearly identical motion to modify conditions of release "to delete the requirement of

6  posting property at 210 La Salle in Piedmont." ECF No. 128. Following a hearing, the magistrate judge

7  denied Mattson's renewed motion and ordered that by December 12, Mattson "be in full compliance

8  with the terms of the bond, including the condition requiring the posting of 210 LaSalle Avenue." ECF

9  No. 140 at 2. On December 12, 2025, 210 La Salle was posted with the Clerk of Court. *See* ECF No.

10  145.

11        On December 19, 2025,[4] Mattson brought the instant motion, styling it as an "appeal from

12  Magistrate's Order Denying Renewed Motion to Modify Bond," ECF No. 151, arguing that the

13  conditions set by the magistrate judge violate the Eighth Amendment's Excessive Bail clause. *Id.* at 5.

14  **DISCUSSION**

15  **I.    Record Before the Magistrate Judge and Legal Standards**

16        A defendant who is ordered released by a magistrate judge "may file, with the court having

17  original jurisdiction over the offense, a motion for amendment of the conditions of release." 18 U.S.C.

18  § 3145(a)(2). *See also United States v. Doby*, 928 F.3d 1199, 1205 (10th Cir. 2019) (recognizing Bail

19  Reform Act's procedure for review of magistrate judge's decisions related to release or detention);

20  *United States v. Riley*, No. 2:12-cr-478, 2014 WL 257863, at *3 n.3 (D. Nev. Jan. 22, 2014) (construing

21  defendant's "objection" to magistrate judge's release order as motion to amend conditions).

22        Although this Court's review of the proceedings before the magistrate judge has been described

23  as *de novo*, the Court "is not required to start over in every case, and proceed as if the magistrate

24  [judge]'s decision and findings did not exist." *United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th

25  Cir. 1990). A district court considering a motion taking issue with a magistrate judge's conclusions as

26

27

28      [4] Because of an electronic filing error, Mattson subsequently refiled the motion on December 22, 2025. *See* ECF Nos. 148, 151.

to detention or release need not hold an evidentiary hearing. *See id.* at 1193.  Instead, it may rely on a

review of the record before the magistrate judge. *Id.*  Here, that record includes the following:

| Description | Docket Entry |
|---|---|
| Government's Motion for Detention Pending Trial | 6 |
| Victim Statements Related to Government's Motion for Detention Pending Trial | 7 |
| Additional Victim Statements Related to Government's Motion for Detention Pending Trial | 14 |
| Pretrial Services Report ("Bail Study") | 15 |
| Defendant's Opposition to Government's Motion for Detention Pending Trial | 16 |
| Government's Reply to Defendant's Opposition | 17 |
| Transcript of May 28, 2025 Detention Hearing | 97 |
| Order Setting Conditions of Release | 23 |
| Defendant's Status Memorandum Re Continued Detention Hearing | 33 |
| Government's Memorandum in Opposition to Defendant's Status Report | 35 |
| Transcript of June 11 Status hearing | 98 |
| Superseding Order Setting Conditions of Release | 37 |
| Defendant's Motion to Modify Conditions of Release | 89 |
| Government's Response in Opposition to Defendant's Motion to Modify Conditions of Release | 90 |
| Minute Entry/FTR of October 1, 2025 Hearing on Defendant's Motion to Modify Conditions of Release | 92 |
| Defendant's Renewed Motion to Modify Conditions of Release | 128 |
| Government's Response to Defendant's Renewed Motion to Modify Conditions of Release | 132 |
| Victim Statements Re Defendant's Renewed Motion to Modify Conditions of Release | 133 |
| Defendant's Reply to Government's Response re Renewed Motion to Modify Conditions of Release | 136 |
| Supplemental Victim Statements Re Defendant's Renewed Motion to Modify Conditions of Release | 137 |

| Description | Docket Entry |
|---|---|
| Minute Entry/FTR of December 10, 2025 hearing on Defendant's Renewed Motion to Modify Conditions of Release | 139 |

A court's evaluation of pretrial detention or the appropriate bond conditions "mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). To determine what conditions of release will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, the Court considers (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. 18 U.S.C. § 3142(g); *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

Danger to the community does not just mean physical danger. It can include, as most relevant here, financial harms. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Giordano*, 370 F.Supp.2d 1256, 1270 (S.D. Fla. 2005) ("There can be no question that an economic danger, like that posed by a serial defrauder, falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act."); *United States v. Madoff*, 586 F. Supp.2d 240, 253 & n.11 (S.D.N.Y. 2009) (accepting that "in certain circumstances an economic or pecuniary harm may give rise to a consideration of danger" for purposes of pretrial detention and noting that "[t]he question appears to become one of propensity to commit further crimes, even if the resulting harm is solely economic").

And some cases, the unmitigated prospect of obstruction alone may itself serve as a basis for pretrial detention. Even prior to the Bail Reform Act, courts recognized "an inherent right of the trial court to protect the integrity of the judicial process by ordering detention if necessary" in circumstances relating to obstruction, such as "subsequent information that the defendant has threatened or plans to injure or intimidate a juror or witness or plans to flee." *See* 131 Cong. Rec. S00000-12, 1985 WL 707152, 53. *See also* Order, ECF No. 92, *United States v. Combs*, No. 1:24-cr-542-AS (S.D.N.Y. Nov. 27, 2024) (considering, in order detaining defendant pending trial, "evidence supporting a serious risk of

witness tampering").  In detention-related proceedings, the government may proceed by proffer or hearsay.  *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986)

It may be true, as Mattson says, that victim statements are not "a determinative factor under the Bail Reform Act," Def. Mot. at 11, but it was not only proper for the magistrate judge below to consider the victims views; he was required to do so.  Under the Crime Victims' Rights Act (CVRA), victims have a right to be "reasonably heard at any public proceeding in the district court involving release."  18 U.S.C. § 3771(a)(4).  *Accord In re Davis*, 146 F.4th 710, 721 (9th Cir. 2025).  "The CVRA makes crime victims participants in the criminal process."  *United States v. Burkholder*, 590 F.3d 1071, 1074 (9th Cir. 2010).  The purpose of the right to be reasonably heard is "to allow the victim to appear personally and directly address the court."  *Kenna v. U.S. Dist. Ct.*, 435 F.3d 1011, 1016 (9th Cir. 2006) (citing 150 Cong. Rec. S4268 (daily ed. April 22, 2004) (statement of Sen. Kyl)).  Victims "have an indefeasible right to speak," one which "cannot be defeated, revoked, or made void."  *Kenna*, 435 F.3d at 1016.  The CVRA "clearly meant to make victims full participants" – a victim has the right "to look *this* defendant in the eye and let him know the suffering his misconduct has caused."  *See id.* at 1016–17 (emphasis in original).  Consistent with that purpose, the Ninth Circuit has concluded that the "right to be reasonably heard" provides victims the right to speak at proceedings covered by the CVRA.  *Id*.  Although *Kenna* was a case about sentencing, its logic applies equally to hearings involving a defendant's release. *United States v. Turner*, 367 F. Supp. 2d 319, 333 (E.D. N.Y. 2005) (victims have the right to be heard at detention hearings).[5]  In addition to addressing the Court in person, the victims may also choose to exercise their statutory right to be heard through the submission of written statements.  *See Burkholder*, 590 F.3d at 1075 ("Here, the victims chose to assert their right to be reasonably heard by submitting written statements").

---

[5] Because the January 9, 2026 hearing on the defendant's current motion, too, is a "public proceeding in the district court involving release," 18 U.S.C. § 3771(a)(4), Mattson's victims have a right to address the Court at that hearing, if one is held.  The government's victim-witness staff is in the process of attempting to determine if and how many victims desire to speak at or provide written statements in advance of that hearing, and the government anticipates providing that information to the Court as soon as practicable.

## II.    No Court Has Ever Found a Financial Condition of Release to Violate the Eighth Amendment, and Mattson's Bail is Not Unconstitutionally Excessive.

Mattson does not appear to argue that the magistrate judge failed to comply with the procedural requirements of Bail Reform Act of 1984 ("BRA"), instead claiming only that his conditions violate the Eighth Amendment.    To the extent that Mattson seeks to bring an as-applied Eighth Amendment challenge to the financial conditions of release, he is seeking unprecedented relief.  The Supreme Court has upheld the BRA against a facial Constitutional challenge.  *United States v. Salerno*, 481 U.S. 739 (1987).  "The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil."  *Id.* at 754.  The Eighth Amendment provides no absolute right to bail, *see id.* at 753. and the Ninth Circuit has categorically held that it does not offend the Constitution or the BRA even where "a defendant is granted pretrial bail, but is unable to comply with a financial condition, resulting in his detention." *United States v. Fidler*, 419 F.3d 1026 ,1028 (9th Cir. 2005) (per curiam).

In *Galen v. Cnty. of Los Angeles*, 477 F.3d 652 (9th Cir. 2007), a domestic violence defendant claimed that two Los Angeles County Sheriff's Deputies violated the Excessive Bail clause by requesting that a state judicial officer set the defendant's bail at $1 million instead of the normally scheduled $50,000.  *Id.* at 656 –57.  In determining excessiveness, a Court looks to "the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the purpose of achieving those interests."  *Id.* at 660.  "Excessiveness cannot be determined by a general mathematical formula, but rather turns on the correlation between the state interests a judicial officer seeks to protect and the nature and magnitude of the bail conditions imposed in a particular case.  Without examining the relevant state interests, courts cannot determine whether bail conditions are constitutionally excessive."  *Id.* at 662 (citation omitted).  "Neither the plain language of the Eighth Amendment itself, nor the case law interpreting the Excessive Bail Clause require that the conditions imposed on a defendant's release will be the 'least restrictive.' *Salerno* and *Stack* only require that the condition not be excessive in light of the government's interest; that the condition be reasonably calculated to achieve the government's legitimate interest." *United States v. Gardner*, 523 F.Supp. 2d 1025, 1031 (N.D. Cal. 2007).  Here, the relevant interests are the ones contemplated by the BRA—risk

of flight, danger to the community, and obstruction of justice.  The record is replete with evidence that those are the risks that the government and the magistrate judge sought to address when crafting the details of Mattson's bond.

Mattson claims that "defendants facing far more serious charges have successfully argued that their bail was excessive in violation of the Eighth Amendment."  Def. Mot. at 5.  But that is wrong.  In *United States v. Leisure*, 710 F.2d 422 (8th Cir. 1983), the only case the defendant cites for this proposition, the magistrate judge set bond at $1 million cash and $2 million cash, respectively, because he found that there was a substantial likelihood that release would lead to obstruction of justice and that the "pendency of capital offenses in Missouri state court is another factor creating a substantial incentive" of risk of flight.  *Id.* at 425.  The Eighth Circuit reversed, but it did so on *statutory*, not Constitutional grounds: "We do not think the very substantial cash bonds represent a reasonable calculation of the conditions necessary to assure the appellants' appearance at trial."  *Id.*  (citing former 18 U.S.C. § 3146(b)). [6]  And the statute on which the *Leisure* court relied—the Bail Reform Act of 1966—has since been superseded by the Bail Reform Act of 1984, which significantly expanded the circumstances under which a criminal defendant may be detained pretrial and the statutory conditions under which release may be granted.  *See* S. Rep. 98-225 at 3185–86 (noting that the adoption of Bail Reform Act of 1984 "marks a significant departure from the basic philosophy of the bail reform act, which is that the sole purpose of bail laws must be to assure the appearance of the defendant at judicial proceedings").  *See also Motamedi*, 767 F.2d at 1406 (explaining differences between Bail Reform Act of 1966 and Bail Reform Act of 1984).  Mattson has not pointed to any case in the federal reporter where a district court or Court of Appeals has held that a magistrate judge's setting of financial conditions of bond violates the Eighth Amendment's Excessive Bail clause.[7]

---

[6] Similarly, in *United States v. Beaman*, 631 F.2d 85 (6th Cir. 1980), the Court referenced the Excessive Bail clause but ultimately reduced bail on the basis of a local rule's conflict with the then-applicable bail statute.  *Id.* at 87.

[7] Under limited circumstances, some district courts have found certain non-financial mandatory pretrial release conditions for defendants charged with sexual offenses to violate the Excessive Bail clause.  *See, e.g., United States v. Polouizzi*, 697 F.Supp.2d 381, 395 (E.D.N.Y. 2010); *United States v. Torres*, 566 F.Supp.591, 602 (W.D. Tex. 2008).  *But see United States v. Peeples*, 630 F.3d 1136, 1139 (9th Cir. 2010) (per curiam) (denying defendant's as-applied Eighth Amendment challenge); *United States v. Gardner*, 523 F.Supp.2d 1025, 1028–31 (N.D. Cal. 2007) (Chen, J.) (same).

1    Indeed, the Supreme Court has upheld the Bail Reform Act of 1984 against Constitutional

2    challenge.  In *United States v. Salerno*, 481 U.S. 739 (1987), criminal defendants argued that the Act's

3    provision allowing for detention of individuals who posed an unreasonable danger to the violated their

4    rights to substantive due process and the Excessive Bail clause.  *Id.* at 740.  The Supreme Court

5    concluded that "the Act survives a challenge founded upon the Eighth Amendment."  *Id.* at 752.  The

6    Court recognized that the Excessive Bail clause "says nothing about whether bail shall be available at

7    all."  *Id.*  And it rejected the notion that "the Eighth Amendment categorically prohibits the government

8    from pursuing other admittedly compelling interests through regulation of pretrial release."  *Id.* at 753.

9    As the Court ultimately concluded,

10      The [BRA] authorizes the detention prior to trial of arrestees charged with serious felonies who
        are found after an adversary hearing to pose a threat to the safety of individuals or to the
11      community which no condition of release can dispel.  The numerous procedural safeguards
        detailed above must attend this adversary hearing.  We are unwilling to say that this
12      congressional determination, based as it is upon that primary concern of every government—a
        concern for the safety and indeed the lives of its citizens—on its face violates either the Due
13      Process Clause of the Fifth Amendment or the Excessive Bail Clause of the Eighth Amendment.

14    *Id.* at 755.[8]

15    On this record, the magistrate judge's requirements—a $4 million bond partially secured by the

16    equity in two properties and $200,000 in cash—are "reasonably calculated to achieve the government's

17    legitimate interest," *Gardner*, 523 F.Supp.2d at 1031, so Mattson's constitutional challenge must fail.

18    **III.    The Magistrate Judge Correctly Concluded That the Present Bond Conditions Were the
          Least Restrictive Requirements to Mitigate the Defendant's Risk of Flight and Danger to
19        the Community**

20    To the extent the Court construes the defendant's motion as going beyond an Eighth Amendment

21    challenge to a generalized challenge to Mattson's conditions of release, the Court should reject those

22    claims too.  Here, the magistrate judge held a five-hour detention hearing on May 28 and a subsequent

23    hearing on June 11.  After each hearing, he issued conditions of release, including a requirement that

24    Mattson post two properties to partially secure the $4 million bond.  He subsequently declined to modify

25

26    ───────────────
        [8] Mattson's quotation of *Stack v. Boyle*, 342 U.S. 1, 5 (1951), Def. Mot. at 4, is misguided
27    because (1) that case involved the application of a statute that preceded both the Bail Reform Act of
      1966 *and* the Bail Reform Act of 1984, and (2) in that case, the government presented no evidence
28    specific to the defendant, but only relied on "a certified record showing that four persons previously
      convicted under the Smith Act . . . had forfeited bail."  *Id.* at 3.

1   that bond following two subsequent rounds of briefing and hearings on October 1 and December 10.

2   Importantly, the magistrate judge adopted pretrial services' view that Mattson posed both a risk of non-

3   appearance and a danger to the community, *see* ECF No. 15 at 10, and concluded that the significant

4   conditions were required to mitigate those risks.

5          Mattson argues that "time has proven" that he is not a flight risk. Def. Mot. at 6. But

6   particularly in a case like this, where no trial date has even been set, six months of partial compliance is

7   hardly persuasive. A bond setting conditions of release is designed to last *through* trial to address the

8   government and society's interests in assuring that the defendant appears as required and does not pose a

9   danger to the community. Abiding by conditions of release is what a defendant on release is *supposed*

10  to do; his reward for compliance is staying out of custody pending trial and not facing revocation or

11  contempt proceedings. Nor does the fact that Mattson has appeared for the early stages of these

12  proceedings (without the security in place) ensure that he will continue to appear as the case proceeds

13  and the choice between flight and prison becomes more stark. "It is presumed that the defendant will

14  abide by the conditions imposed and his demonstrated ability to do so is what allows him to remain on

15  pretrial release. The fact that Defendant has complied with his conditions of release is what allows him

16  to remain out of custody." *United States v. Kube*, No. 1:19-cr-00257, 2020 WL 1984178, at *5 (E.D.

17  Cal. Apr. 27, 2020). *See also United States v. Ebonka*, 733 F.Supp.3d 967, 969 (D. Nev. 2024) (noting

18  that "Case law abounds that a defendant's compliance with the current conditions of pretrial release is

19  not in and of itself grounds to modify those conditions" and collecting cases).

20         And even if complete compliance with conditions of release *was* a reason to reduce Mattson's

21  bond, that is not the case here. The conditions set by the magistrate judge on May 28, 2025 required

22  Mattson to post two substantial pieces of property; he did not post the second until December 12, 2025.

23  The conditions set by the magistrate judge on May 28, 2025, and reaffirmed on June 11 and December

24  11 ordered a total of $200,000 in cash to be posted; that has not been done. Compliance with the terms

25  and conditions of bond means compliance with all those conditions, not just some.

26         Mattson's reliance on *Motamedi*, Def. Mot. at 6–7, is deeply misplaced. *Motamedi* was a case

27  about the standard for pretrial detention, not the conditions of release. 767 F.2d at 1404. Unlike

28  Mattson, who faces decades in prison upon conviction, the most serious charge Motamedi faced was 371

conspiracy and an ensuing maximum penalty of five years.  *Id.*  And Motamedi, a U.S. permanent

resident, had applied for U.S. citizenship, had 85 relatives in the area, including his wife, brothers,

mother, and father, and his parents posted their residence to secure his release.  *Id.* at 1408.  Mattson, by

contrast, maintains limited contact with his siblings and parents, all of whom reside outside the district.

ECF No. 15 at 1.  And neither his parents nor his in-laws are willing to post their own properties to

secure his release.  ECF No. 128 at 5.  Finally, although Mattson, like Motamedi, knew of the

government's investigation prior to his arrest, unlike Motamedi, he apparently used that knowledge to

remove evidence, both digital and physical, from his residence before the government could find it.

### A.    The Nature and Circumstances of the Offense and Mattson's Statutory Sentencing Exposure Militate in Favor of a Substantial Bond

Mattson has been charged with orchestrating a long-running Ponzi scheme with hundreds of

victims.  The Indictment charges him with seven wire fraud counts, money laundering, and obstruction

of justice.  Each count carries between a 10 and 20-year statutory maximum.  Given the nature of the

scheme, the number of victims, and the loss amount, an overly conservative estimate of the low end of

his Guidelines range, assuming acceptance of responsibility, is at least 188 months, or 15 years,

incarceration.  The seriousness of the charges, reflected in the penalties that Mattson faces, provides a

substantial incentive to flee, particularly for someone like Mattson, who is 64 years old and faces the

prospect of spending a substantial portion of his remaining years in prison, if convicted.  *See United

States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible

under the present indictment, the defendants have an even greater incentive to consider flight."); *see also

United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her

knowledge of the seriousness of the charges against her gave her a strong incentive to abscond).  And

that is just the *present* Indictment:  as the government has now publicly stated, *see* U.S. Opp. to Def.'s

Mot. to Quash Subpoena, ECF No. 124 at 10–12, the criminal investigation of Mattson is ongoing.

Mattson's sentencing exposure—and thus his incentive to flee—is likely to increase, not diminish.

### B.    There is Overwhelming Evidence of the Defendant's Guilt

Likewise, overwhelming evidence of the defendant's guilt "makes it more likely that he will

flee," particularly in light of the term of imprisonment that Mattson faces here.  *United States v. Gebro*,

948 F.2d 1118, 1122 (9th Cir. 1991). Although the weight of the evidence is the least important factor in a bail decision, the Court is required to consider it in assessing whether there are conditions that can reasonably assure a defendant's appearance. *Motamedi*, 767 F.2d at 1408.

Here, Mattson signed an indemnity agreement in January 2024 wherein he admitted to, among other actions, entering into "numerous" third-party transactions "with individuals and/or entities pursuant to which [Mattson] has secured funds on terms and conditions not clearly documented" and the parties, including Mattson,

> acknowledge and agree that: (i) none of the Third Party Transactions were presented to the Board or shareholders of LeFever Mattson prior to the date that the Third Party Transactions were entered into, (ii) none of the Third Party Transactions were authorized or approved by the Board or shareholders of LeFever Mattson at any time prior to or after the date that the Third Party Transactions were entered into, (iii) neither LeFever nor LeFever Mattson is in any way a party to or obligated in connection with any of the Third Party Transactions, and (iv) neither LeFever nor LeFever Mattson received any benefit, directly or indirectly, economic or otherwise, in connection with or as a result of the Third Party Transactions.

In other words, Mattson has already admitted to the core fraud alleged in the Indictment—that contrary to his representations to investors, LM did not know about any of the off-books investors, and LM was never liable to any of the off-books investors.[9]

The admissions contained in the indemnity agreement are corroborated by Mattson's written and oral representations to hundreds of investors. Some investors took detailed and contemporaneous notes of Mattson's oral representations to them over the years; he also created and provided them fraudulent written contracts to make the investments appear legitimate. Despite his attempts to delete his own copies of those documents, many investors still have them and have provided them to the government. Those notes and documents are corroborated by Mattson's emails and his text messages. Although the government has not yet received the files it demanded from Mattson's former lawyers, *see* Def. Mot. to Quash Grand Jury Subpoena Ex. B, ECF No. 115-2, those files are also likely to contain additional evidence of Mattson's crimes. *See* Decl. of SA Rachael Grace ISO U.S. Opp. to Def.'s Mot. to Quash &

---

[9] Mattson has sought recission of this agreement in the course of civil proceedings, but regardless of whether he is successful there, it would be admissible against him in any criminal trial as a statement of a party-opponent. *See* Fed. R. Evid. 801(d)(2).

1    Ex. 2, ECF No. 124.

2           What's more, in May 2024, Mattson confessed to at least one witness.  He told that witness,

3    among other things, that he was sorry, that there was no explanation for what he had done, that he had

4    falsified documents, including Form K-1s, and acknowledged that it was likely he would go to jail.

5           The evidence against Mattson is overwhelming, which provides a substantial incentive to flee.

6           **C.     The Full Scope of Mattson's Access to Assets is Still Unknown**

7           Mattson appears to suggest that, because he now "has absolutely no assets at his disposal," Def.

8    Mot. at 8, his risks of flight and danger are mitigated.  But Mattson's concerted and continuing efforts to

9    conceal the true scope of his assets from the Court tell a different story.  Mattson refused to tell pretrial

10   services about his assets, *see* ECF No. 15 at 8, and even when seeking appointed counsel, never

11   submitted the customary financial affidavit.  As this Court knows from prior litigation, the declarations

12   Mattson *has* submitted to this Court regarding his finances have contained omissions and half-truths. *See*

13   U.S. Opp. to Def. Mot., ECF No. 51 at PageID 12, 18–19 (describing Mattson's omissions in first

14   declaration); U.S. Opp. to Def.'s Second Mot., ECF No. 73, at PageID 18 (describing Mattson's false

15   statements regarding securities and retirement account in second declaration); Gov't. Opp. to Def.'s

16   Third Mot., ECF No. 105, at 19–20 (describing additional discrepancies with respect to Defendant's

17   assets).  And recall that Mattson hid from the magistrate judge and this Court the existence of

18   WITNESS-1, who has a one-third ownership share in 210 La Salle.  *See* U.S. Opp. to Def. Mot. to

19   Modify Pre-Trial Asset Restraint, ECF No. 51 at 6–8.

20          In late November 2025, Mattson's bankruptcy trustee, relying on information "solely provided

21   by" Mattson, listed his total assets at nearly $32 million and calculated a net worth of $20 million.[10]  *See*

22   ECF No. 132-3 at 2.  And even if those assets are not *currently* accessible to Mattson because of his

23   bankruptcy, the filing reflects a fundamental truth: the amount of money required to secure Mattson's

24   appearance is much greater than that required to secure the ordinary defendant's appearance.  Four

25

26          ───────────────────
             [10] Ordinarily, a debtor like Mattson is required to provide this information to the bankruptcy
27   court under penalty of perjury; in this case, he refused, citing the Fifth Amendment privilege, but the
     information still originated from him. *See* ECF No. 185-1 ("the information, disclosures, and statements
28   contained in the Schedules of Assets and liabilities and Statement of Financial Affairs filed
     contemporaneously herewith contain information solely provided by Kenneth W. Mattson").

million dollars to the Mattsons, who claim $32 million in assets now and who at one point claimed a total net worth of nearly $220 million, *see* Ex. R to Lee Decl., ECF No. 73-7 at DOJ-00138563 (personal financial statement), is not very much.

Mattson's motion does not propose alternate conditions of bond, instead simply stating that his "bail is excessive under the Eighth Amendment and should be reduced accordingly." Def. Mot. at 11. But to the extent that he continues to seek the "deletion of 210 La Salle," he is asking the Court to allow him to remain out of custody on a bond that is only secured by $100,000 in cash and the posting of $680,000 in real estate (owned by his sister-in-law, with whom he has a distant relationship and who assisted in dissipating his assets in anticipation of the execution of a search warrant). That security constitutes less than 20 percent of the total bond amount, with one less surety. That is far short of the risk of "deeply-felt hurt" required to ensure compliance for someone like Mattson. *Townsend*, 897 F.2d at 996.

Nor is legal title the only issue here: Mattson has *access* to substantial resources even if he does not hold legal title to them, as demonstrated by his continuing possession and control of at least two multimillion-dollar residences in Sonoma. *See* Mot. of KS Mattson Partners, LP for Relief from Automatic Stay at 1–2, ECF No. 186, *In re KS Mattson Partners, LP*, No. 24-10714 CN (Bankr. N.D. Cal. Nov. 25, 2025) ("One of KSMP's most valuable assets is [Mattson's residence]—a luxury home that would command up to $22,000 per month in rent on the open market. Yet Mattson and his wife continue to live there for free. They have no legal right to occupy the Property, have never paid rent, and have refused to vacate to facilitate its sale. Their continued occupancy directly reduces the value available for distribution to victims. A person of good conscience would not continue living in a multimillion-dollar home for free while the victims of his alleged fraud wait for recoveries. But Mattson has declined to leave voluntarily.")[11]  Mattson also presumably has access to KSMP's property on 969 Rachael Road, an $8.5-million residence that "is currently occupied by Mattson's daughter, who is also

---

[11] In his sole response to this motion, which sought the bankruptcy court's permission to initiate eviction proceedings, Mattson submitted a declaration in which he took issue with the Responsible Individual's estimate of the rental income and claimed that his eviction would cause a fire hazard. Decl. of Kenneth Mattson in Opp. to Mot. for Relief from Stay, ECF No. 194, *In re KS Mattson Partners, LP*, No. 24-10714 CN (Bankr. N.D. Cal. Dec. 9, 2025).

1    not paying rent." *Id.* at 3.

2        Significant questions remain about Mattson's control of and access to assets that could be used to

3    aid in flight, and the evidence and information the Court has received since the magistrate judge's initial

4    decision has compounded, not diminished, those concerns.  Moreover, the fact one of the properties that

5    is part of the bond package belongs to Mattson's wife (and functionally to him)—as opposed to a

6    sometimes-estranged relative by marriage—means that risking the equity in it provides Mattson

7    substantially greater incentive to abide the conditions of release than the mere posting of the Reno

8    property.

9        **D.    The Conditions of Bond Mitigate the Defendant's Economic Danger to the
             Community**

10

11       Mattson argues that his economic danger to the community no longer exists because, for

12   approximately six months while under Indictment, the government has not learned of him soliciting

13   other investments and defrauding new investors.  Def. Mot. at 8.  This argument carries little weight.

14   There is substantial evidence that Mattson has been defrauding investors through a variety of scheme for

15   the better part of the last 16 years.  These schemes went undetected for most of that time.  The fact that

16   the government does not have evidence that Mattson has engaged in any new fraud in the last six months

17   does not mean that he has not done so, nor does it obviate the need for sufficient security to dissuade

18   Mattson from defrauding communities that are unaware of his case or using a different name to engage

19   in new fraud schemes.  These are not merely theoretical risks.  *See, e.g,.* U.S. Mot. to Order Defendant

20   Detained, ECF No. 157, *United States v. Kim*, No. 21-CR-164 (N.D. Cal. Apr. 16, 2024) (fraud

21   defendant on pretrial release tricking new victims into loaning him money);  U.S. Appeal of Mag.

22   Judge's Denial of Mot. to Order Def. Detained, ECF No. 148, *United States v. Palermo*, Nos. 20-CR-

23   190-JD, 21-CR-187-JD (N.D. Cal. Jun. 21, 2023) (fraud defendant on pretrial release using false name

24   while defrauding out-of-state business owners).

25       The bond as currently situated—guaranteeing that Mattson will suffer *some* personal loss of a

26   substantial asset if he violates its terms—is an additional tool to help mitigate both his risk of flight and

27   danger.

28

### E.    Mattson's Comparison to Two Cherry-Picked Cases is Unhelpful and Unavailing

The defendant cites two cases, seemingly chosen at random—*United States v. Holmes* and *United States v. Hudson*—and essentially argues that because those bonds were different, Mattson's bond must be unconstitutionally excessive.  Def. Mot. at 8–9.  The defendant has raised and the magistrate judge has previously considered the issue of the circumstances of other defendants' bonds in denying the defendant's requests.  As set forth in the government's papers before the magistrate judge, the fact that a judicial officer set a different bond for a different defendant under different circumstances is not relevant to the Court's bail determination in this case.  The Bail Reform Act requires "an individualized evaluation."  *Diaz-Hernandez*, 943 F.3d at 1198.  And in any case, the government, too, can find several cases in which a fraud defendant was required to post substantial secured bonds, in greater amounts than the magistrate judge required here. *See, e.g., United States v. Lachwani*, No. 3:21-cr-00353 (N.D. Cal.); *United States v. Lynch*, No. 3:18-cr-00577 (N.D. Cal.).  In other cases, fraud defendants have been detained pending trial.

Unlike the sentencing statute, the Bail Reform Act does not call for the Court to consider a survey of other defendants.  *Compare* 18 U.S.C. § 3553(a)(6)  *with* 18 U.S.C. § 3142.  Rather, the Court must make an individualized determination to determine what conditions will "reasonably assure" the defendant's appearance as required and the safety of the community. 18 U.S.C. § 3142(c).  *See also* ECF No. 90 at 10–12 (setting forth in detail the differences between defendant's conduct, which involved looking senior citizens in the eye and taking money from them at their kitchen tables, and cases where sophisticated venture capitalists are defrauded of substantial sums).  Mattson is no Elizabeth Holmes, who *actually* experienced "intense media scrutiny," Def. Mot. at 7, of global scope, and thus arguably had less ability to vanish unnoticed.  And in the only other case that Mattson cites, Hudson's relatives posted a significant sum for Hudson, who reported to pretrial that he had a net worth of negative $4.8 million.  Moreover, Hudson is far less than a convincing example because Hudson has already violated the terms and conditions of his release, suggesting that those conditions were not sufficient.  *See* ECF Nos. 20, 22, 29, *United States v. Hudson*, No. 25-CR-349 RFL (N.D. Cal)

Here, the unsupported and unsecured promises of the defendant's other sureties—none of whom own unencumbered assets even approaching the $4 million bond amount and many of whom are

judgment-proof, are not sufficient to assure his appearance, particularly here where some of them have been involved in his obstruction efforts. And as pretrial services concluded, there are serious concerns here: the defendant's attempts to obstruct justice, the fact that his fraud involved hundreds of millions of dollars over the period of just five years, *see* Indictment ¶ 40, his history of moving money from account to account, and unaccounted for funds all tend to increase the risk that he will not appear as required. *See generally* ECF No. 6 at 5–11. The defendant's serious risk of flight and economic danger to the community are not sufficiently mitigated by the posting of property worth less than 20 percent of the bond value by a questionable co-signer.

## CONCLUSION

"At bottom, the fact that a defendant does not want to be bound by the existing restrictions does not change that those restrictions are necessary." *Ebonka*, 733 F.Supp.3d at 971. For the foregoing reasons, the Court should construe Mattson's filing as a motion to amend his conditions of release and deny the motion.

DATED: December 26, 2025                    Respectfully submitted,

                                            CRAIG H. MISSAKIAN
                                            United States Attorney

                                            */s/ Nikhil Bhagat*

                                            _____
                                            NIKHIL BHAGAT
                                            Assistant United States Attorney